OPINION
ANDERSON, Justice.
In this case, we are presented with the question of whether pastors and their church can be held liable for statements . the pastors made about a parishioner during formal church disciplinary proceedings. Appellants LaVonne and Henry Pfeil allege that they were defamed by the pastoral staff of St. Matthew Lutheran Church[1] during two church disciplinary proceedings that were held for the purpose of excommunicating the Pfeils from St. Matthew. The district court dismissed the Pfeils’ claims with prejudice on First Amendment grounds, and the court of appeals affirmed. Because the First Amendment to the United States Constitution protects the right of a religious organization to make, autonomous decisions regarding church discipline and membership, we affirm the district court’s dismissal of the claims.
I.
Prior to 2011, LaVonne and Henry Pfeil were longstanding members of St. Matthew.[2] St. Matthew, in turn, is a member *531 of the-Lutheran Church-Missouri Synod. On August 22, 2011, the Pfeils received a letter signed by St. Matthew’s pastors, respondent Thomas Braun (“Braun”) and respondent Joe Behnke (“Behnke”). The letter contained several allegations regarding the Pfeils’ conduct over the preceding two years, but focused on complaints that the Pfeils had been engaged in “slander and gossip” against the leadership and ministry of the congregation. In addition to criticizing the Pfeils’ behavior, the letter advised the Pfeils that they had excommunicated themselves from St. Matthew and informed the Pfeils that their church membership had been terminated.
Subsequent to the August 22 letter, the Lutheran Church-Missouri Synod advised the leadership of St. Matthew to hold a “special voters’ meeting” so that the congregation could vote to affirm or reject the excommunication decision. The Pfeils and approximately 89 members of St. Matthew attended the special voters’ meeting, which was held on September 25, 2011. Braun addressed the meeting, reading from a set of , prepared remarks, and published the August 22 letter to those present at the meeting. According to the Pfeils, Braun’s remarks and the August 22 letter contained several defamatory statements, including:
• The Pfeils were actively involved in slander, gossip, and speaking against Braun and his wife, Behnke, and the St. Matthew Board of Elders.
• The Pfeils had intentionally attacked, questioned, and discredited the integrity of Braun, Behnke, and other St. Matthew chürch leaders.
. • Other people had observed the Pfeils display anger and disrespect toward Braun. *
• The Pfeils had publicly engaged in “sinful behavior” inside and outside St. Matthew.
• The Pfeils had engaged in behavior ' unbecoming of a Christian.
• The Pfeils had engaged in a “public display of sin.”
• The Pfeils had refused to meet for the purpose of confession and forgiveness.
• The Pfeils had “refused to show respect” toward servants of God and St. Matthew church leadership.
• The Pfeils had led other people into sin.-
• The Pfeils had engaged ‘in slander and • gossip and had' refused to stop engaging in slander and gossip.
• The Pfeils had refused to follow the commands and teachings of God’s word.
After Braun’s remarks, ballots were distributed to the members of St. Matthew who were present at the meeting, and the members voted to affirm the pastors’ decision to terminate the Pfeils’ membership at St. Matthew. Subsequently, in March 2012, a Missouri Synod panel held a hearing to reconsider the Pfeils’ excommunication. The Pfeils allege that during the Synod hearing, Behnke falsely claimed that the Pfeils had recently accused Behnke of stealing money from St. Matthew. The Synod panel also affirmed the Pfeils’ excommunication. ‘
On August 16, 2013, LaVonne Pfeil brought a lawsuit on behalf of herself and Henry* Pfeil, asserting claims for defamation and negligence against St. Matthew, Braun, and Behnke (collectively respondents).[3] On December 24, 2013, respondents filed a motion to dismiss for lack of *532 subject matter jurisdiction pursuant to Minn. R. Civ. P. 12.02(c). Respondents argued that the Pfeils’ claims would cause the district court to become excessively entangled with religion and that the claims were therefore barred by the First Amendment to the United States Constitution under the “ecclesiastical abstention doctrine.”
After resolving Henry Pfeil’s claims on other grounds,[4] the district court concluded that the First Amendment deprived the court of jurisdiction to adjudicate LaVonne Pfeil’s remaining claims and dismissed the case with prejudice. The Pfeils appealed the district court’s ruling and the court of appeals affirmed with respect to the First Amendment issue, concluding that the First Amendment barred all of the Pfeils’ claims.[5] Pfeil v. St. Matthews Evangelical Imtheran Church, No. A14-0605, 2015 WL 134055, at *3-6 (Minn.App. Jan. 12, 2015). We granted review to clarify our jurisprudence regarding the intersection of the First Amendment and civil claims against religious institutions.
II.
A.
The district court and the court of appeals based their rulings on what they termed the “ecclesiastical abstention doctrine.” The legal principle that has come to be known as the “ecclesiastical abstention doctrine” or the “church autonomy doctrine” has its roots in a line of U.S. Supreme Court decisions regarding church property and church schisms. The first, Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872), concerned a dispute over which individuals were entitled to the position of “elder” in a Presbyterian church in Kentucky. Id. at 714. Rather than evaluate the merits of the parties’ arguments regarding church doctrine, the Court deferred to the ruling of the Presbyterian General Assembly, which did not recognize the individuals in question as elders, and indicated the lower courts should have exercised the same deference. See id. at 732-34. The Court viewed judicial review of ecclesiastic tribunals as striking at the very heart of religious freedom and held that allowing civil review would “deprive [religious] bodies of the right of construing their own church laws ... and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.” Id. at 733-34. The essence of the Court’s holding is captured in a now-famous quotation:
*533 The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted ' questions ■ of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general • association, is unquestioned. All who unite'themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to-the total subversion of such religious bodies, if . any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.'- It is of the essence of these'- religious unions, and of their right to establish tribunals for the decision of. questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.
Id. at 728-29.
The U.S. Supreme Court strengthened the doctrine announced in Watson when it decided Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojeyich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).[6] In deciding that the Illinois Supreme Court had violated the First Amendment when it reinstated a defrocked bishop, the Milivojevich Court held that “where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil eourts shall not disturb the decisions of the highest ecclesiastical-tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.”.- Id. at 709, 96 S.Ct. 2372.
But the autonomy granted to religious institutions by the First Amendment is not boundless. The U.S. Supreme Court has repeatedly emphasized that -certain situations allow courts to use “neutral principles of-law” to resolve controversies involving religious institutions and their parishioners. Jones v. Wolf, 443 U.S. 595, 602-05, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979) (approving of the “neutral principles of law” approach as “consistent with the [First Amendment]” and stating that “[w]e cannot agree [with the dissent] that the First Amendment requires the States to adopt a rule of compulsory deference to religious > authority in resolving church property disputes, even where no issue of doctrinal controversy is involved”); Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem’l Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (suggesting that courts could resolve church property disputes if they applied “neutral principles of law”). Indeed, we applied the neutral-principles approach in the context of a negligent counseling claim brought against a pastor by a former parishioner who received counseling services from the pastor. See Odenthal v. Minn. Conference of Seventh-Day Adventists, 649 N.W.2d 426, 430-36, *534 440-41 . (Minn.2002) (using the neutral principles contained in a statute regulating counseling activity to'"determine the standard of care applicable to a pastor providing counseling services).-
The U.S. Supreme Court recently "addressed the ecclesiastical abstention" doctrine in 2012 when it decided Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, — U.S. —, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012). In Hosanna-Tabor,,, a unanimous Supreme Court adopted the so-called “ministerial exception,” a derivative, of the ecclesiastical abstention doctrine, that had been endorsed for years in the federal circuit courts. Id. at-, 132 S.Ct. at 705-06. The ministerial exception exempts churches and religious organizations from compliance with employment discrimination, statutes when making decisions regarding ministerial employees. Id. at —, 132 S.Ct. at 705-06. In adopting the ministerial exception, the Hosanna-Tabor Court relied heavily on Watson, Kedroff, and Milivojevich, and concluded that subjecting churches and religious organizations to discrimination laws in the context of ministerial employment decisions would “interfere[ ] with the internal governance of the church” and violate the Free Exercise Clause and the Establishment Clause of the First Amendment. Id. at-, 132 S.Ct. at 706. The Court further indicated that whether the ecclesiastical abstention doctrine applies’ or whether neutral principles and secular law can be used in a given case turns on whether adjudication would result in “government interference with an internal church decision that affects the faith and mission of the church itself.” Id. at —, 132 S.Ct. at 707)
Although hone of these Supreme Court cases speaks directly to the issues raised by the Pfeils’ claims, several helpful rules can be drawn from them. First, a court cannot overturn the decisions of governing ecclesiastical bodies with respect to purely ecclesiastical concerns, such as internal church governance or church discipline. See Watson, 80 U.S. at 727, 13 Wall. 679. Second, a court may not entertain cases that require the court to resolve doctrinal conflicts or interpret church doctrine. See Milivojevich, 426 U.S. at 720, 96 S.Ct. 2372; Mary Elizabeth, 393 U.S. at 449, 89 S.Ct. 601. Finally, a court may decide disputes involving religious organizations, but only if the court is able to resolve the matter by relying exclusively on neutral principles of law, the court does not disturb the ruling of a governing ecclesiastical body with respect to issues of doctrine, and "the adjudication does not “interfere[] with an internal church decision that" affects the faith and mission of the church itself.” Hosanna-Tabor, — U.S. at —, 132 S.Ct. at 707; see also Wolf, 443 U.S. at 602-05, 99 S.Ct. 3020.
B.
Before addressing the specifics of this case, we must clarify one additional point about the ecclesiastical abstention doctrine. Previously, we have characterized the doctrine as a jurisdictional bar. See Odenthal, 649 N.W.2d at 430-34, 441. The district court, the court of appeals, and the parties also proceeded under the assumption that the doctrine limits a court’s subject matter jurisdiction. See Pfeil v. St. Matthews Evangelical Lutheran Church, No. A14-0605, 2015 WL 134055, at *2-3 (Minn.App. Jan. 12, 2015). In Hosanna-Tabor, however, the U.S. Supreme Court clarified that the doctrine does not relate to subject matter jurisdiction. The Court resolved a disagreement among federal circuit courts and held that the ministerial exception actually functioned as an affirmative defense on the merits to an “otherwise cognizable” claim under a federal *535 statute. — U.S. at —, 132 S.Ct. at 709 n. 4 (“We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is “whether the allegations the plaintiff makes entitlé him to relief,’ not whether the court has ‘power to hear [the] casé.’ ” (quoting Morrison v. Nat’l Austl. Bank Ltd., 561 U.S. 247, 254, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010))).
The U.S. Supreme Court’s holding in Hosannar-Tabor leads us to conclude that the ecclesiastical abstention doctrine is not a jurisdictional bar. When applied to a state-law tort claim, the doctrine couíd function as an affirmative defense on the merits, as it does in the context of federal anti-discrimination statutes. See Hosanna Tabor, — U.S. at —, 132 S.Ct. at 709 n. 4. But. we do not believe that the U.S. Supreme Court’s ruling in Hosanna-Tabor compels that result. The unique circumstances surrounding the decision in. Hosanna-Tabor, particularly the fact that the Court was confronted with a statutory cause of action, provide us with some latitude to decide how the doctrine will be applied in Minnesota courts.
As mentioned above, one possible option is to treat the doctrine as an affirmative defense on the merits. We note, however, that the doctrine could also function as a form of abstention, as one of its names implies. We have previously suggested that Minnesota courts could abstain from certain cases. See Gavle v. Little Six, Inc., 555 N.W.2d 284, 290 (Minn.1996) (discussing abstention in the context of a suit involving tortious acts, some of which were committed on tribal land). Abstention provides a narrow exception to a dis-triet court’s obligation to hear the cases that are brought before it, allowing the court to dismiss a claim it would otherwise adjudicate. Id. Ordinarily, abstention is invoked when there is concurrent jurisdiction, or more than one court has been asked to adjudicate the same set of claims. Id. But abstention can also be a useful framework in cases where there are not “two competing lawsuits.” Id.
The parties did not brief or argue the distinction between an affirmative defense and abstention. Because the issue was not briefed and is not essential to the disposition of this case, we decline to char-acterise the doctrine. See State v. Schweppe, 306 Minn. 395, 401 n. 3, 237 N.W.2d 609, 614 n. 3 (1975) (declining to decide an issue not briefed or argued by the parties). Instead, we hold only that the doctrine is not a jurisdictional bar to adjudication. We leave for another time the question of whether the doctrine is best viewed as an affirmative defense on the merits or a form of abstention.
III.
In reaching the conclusion that adjudication of the Pfeils’ claims was barred by the First Amendment, both the district court and the court of appeals relied heavily on two previous court of appeals decisions. In the first, Black v. Snyder, 471 N.W.2d 715 (Minn.App.1991), rev. denied (Minn. Aug. 29, 1991), the court of appeals held that a former pastor could not bring a defamation claim and a whistleblower claim against the church that had terminated her based on statements that were made during the course of her termination.[7] Id. at 718, 720. Essentially, the Snyder court adopted what amounted to a *536 ministerial exception. See id. at 720 (citing Minker v. Baltimore Annual Conference of United Methodist Church, 894 F.2d 1354, 1360-61 (D.C.Cir.1990)). The court observed that “[w]hen claims involve ‘core’ questions of church discipline and internal governance, the Supreme Court has acknowledged that.the inevitable danger of governmental. entanglement precludes judicial review Id. (citing Milivojevich, 426 U.S. at 717, 721, 96 S.Ct. 2372).
Snyder’s ruling was extended by Schorenhals v. Mains, 504 N.W.2d 233 (Minn.App.1993). The Mains court held that two former parishioners could not sue their former pastor for defamation because their claim arose out of four statements the pastor made to the congregation when he was explaining his reasons for terminating the plaintiffs’ membership in the church. Id. at 234-35. The court found that three out of the four' allegedly defamatory statements could not serve as the basis' for a claim because adjudicating the truth or, falsity of the statements would require the court to interpret matters of church doctrine. Id. at 236. The court noted that one of the reasons stated for terminating the parishioners’ membership — that they had engaged in the “direct fabrication of liés” — could possibly be adjudicated without interpreting or inquiring into church doctrine. Id. But, relying on Snyder, the Mains court found that adjudicating a defamation claim based on that statement would violate the First Amendment because it would require an inquiry into matters of church discipline. Id. (citing Snyder, 471 N.W.2d at 720).
Both the district court and the court'of appeals concluded the holding in Mains was directly applicable to the Pfeils’ case and held that adjudicating the Pfeils’ claims would violate the First Amendment. Pfeil, 2015 WL 134055, ah *3-6. It is clear that if we adopt the rule from Mains, the Pfeils’ claims should be dismissed. All of the statements on which the Pfeils base their claims occurred during church disciplinary proceedings, and Mains prohibits civil courts from inquiring into any statements made during the course of a church disciplinary proceeding. 504 N.W.2d at 236. We are, of course, not bound by decisions of the court of appeals, and appellants urge us to modify the rulé from' Mains to allow defamation suits based on statements that are made during the course of church discipline proceedings when adjudicating the truth of the statements'at issue would not require a court to interpret matters of religious doctrine.
A.
Respondents’ primary argument is that adjudicating the Pfeils’ claims would violate the First Amendment to the United States Constitution.[8] Issues of constitutional interpretation are questions of law that we review de novo. State v. Shattuck, 704 N.W.2d 131, 135 (Minn.2005). We have traditionally analyzed the ecclesiastical abstention doctrine as an Es *537 tablishment Clause question and applied the three-pronged test announced in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). See, e.g., Odenthal, 649 N.W.2d at 435. In order to be valid under Lemon, “a state action must have a secular purpose, must neither inhibit nor advance religion in its primary effect, and must not foster excessive governmental entanglement with religion.” Odenthal, 649 N.W.2d at 435. The parties agree that because defamation law serves a secular purpose and does not have the primary effect of advancing or inhibiting religion, only the excessive-entanglement question is in dispute.
It is worth noting that no U.S. Supreme Court case applying the ecclesiastical abstention doctrine has used the Lemon test or announced another general test. The Hosanna-Tabor court grounded the doctrine in both the Establishment and Free Exercise Clauses of the First Amendment, but provided no guidance on the applicability of more general Establishment Clause and Free Exercise Clause jurisprudence. See — U.S. at —, 132 S.Ct. at 706. Regardless, Lemon entanglement prong and Hosanna-Tabor’s, focus on whether adjudicating the claim would interfere with internal decisions that impact religious organizations’ faith and mission appear to be substantially similar inquiries. Thus,' we must determine whether allowing the Pfeils’ claims to proceed will “foster excessive governmental entanglement with religion,” Odenthal, 649 N.W.2d at 435 (citing Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105), or “interfere[ ] with an internal church decision that affects the faith and mission of the church itself.” Hosanna-Tabor, — U.S. at —, 132 S.Ct. at 707.
B.,
Courts from other jurisdictions that have faced similar facts have generally adopted one of two approaches. Respondents urge us to adopt a rule that adjudicating any defamation claim arising out of a statement made during a church disciplinary . proceeding violates- the First Amendment, as several other courts have done.[9] The Pfeils have asked us to adopt a claim-by-claim, element-by-element approach to the ecclesiastical, abstention doctrine.[10] Specifically, the Pfeils direct us to *538 Connor v. Archdiocese of Philadelphia, 601 Pa. 577, 975 A.2d 1084 (2009), and argue that we should adopt the rule that the Pennsylvania Supreme Court announced in that case.
The Connor court, ruled that a student who was expelled from- a religious school could maintain, an action for defamation based on statements made during the course of his expulsion. Id. at 1113. In reaching that ruling, the Connor court announced a broader rule to govern ecclesiastical abstention cases. According to Connor, a court confronted with an ecclesiastical abstention issue should evaluate each individual claim brought by the plaintiffs and determine whether it is “reasonably likely” that the plaintiffs could prove each element without intruding on the “sacred precincts.” Id.
As' an initial matter, the Pfeils have conceded here that the majority of the statements detailed in their’ second amended complaint cannot serve as the basis for a defamation claim, even under the more liberal rule announced in Connor, because adjudicating the truth or falsity of the statements would require the cóurt to consider and interpret matters of church doctrine. See Milivojevich, 426 U.S. at 720, 96 S.Ct. 2372; Mary Elizabeth, 393 U.S. at 449, 89 S.Ct. 601. For instance, a court could not decide whether the Pfeils were engaged in a “public display of sin” without interpreting the meaning of the word “sin” as a matter of Lutheran doctrine — a determination that would clearly be unconstitutional.
The Pfeils maintain that four of the statements discussed in the complaint can be adjudicated without violating the First Amendment: (1) that the Pfeils “perpetuated falsehoods” about St. Matthew and its pastors, (2) that the pastors' of St. Matthew had received numerous complaints about the Pfeils’ slander and gossip, (3) that the Pfeils accused Behnke of .stealing money from the church shortly before the Synod hearing, and (4) that the Pfeils committed “breaches of confidentiality.” The Pfeils argue that a court could use neutral principles of law to -determine the truth of these statements and, consequently, adjudicating a claim based on these four statements would not lead to excessive entanglement with religion. Respondents and their amicus, the Lutheran Church-Missouri Synod, counter that the religious context in which these statements were made necessarily precludes judicial intervention.
G.
Respondents argue that allowing a court to adjudicate a claim based, on statements made during a .church disciplinary proceeding would unduly entangle the court with religion and severely interfere with, the ability of religious organizations to govern their own affairs. To begin with, respondents posit that because the statements were made during.the course of a church disciplinary hearing, each statement has .some religious meaning and a court cannot simply sort so-called “secular” statements from “religious” ones. '
This argument has merit. Many of the statements the Pfeils identified in their complaint are obviously religious in nature. Although other statements seem more secular in nature, it would certainly be difficult to differentiate between secular and religious statements, especially when the context in which the statements were rtiade was clearly religious. A statement-by-statement analysis would be, at best,, a difficult endeavor and, at worst, a court might be forced to interpret doctrine just to determine whether or not a statement had a religious meaning. It is precisely this sort of'complicated and messy inquiry that we seek to avoid by prohibiting courts *539 from becoming excessively entangled with religious institutions.
Respoñdents also argue that the Pfeils’ claims are nothing more than an attempt- to circumvent the U.S. Supreme Court’s rulings in Watson and Milwoje-vich and obtain judicial review of the decision to excommunicate them. There is no doubt that the First Amendment protects the right of churches and religious organizations to make decisions regarding their membership. See Watson, 80 U.S. at 727. To. some degree, the Pfeils’ defamation claims are a request to evaluate the accuracy of the facts used to support respondents’ decision to excommunicate the Pfeils. Some courts that adopt an absolute position oh adjudicating suits arising out of church disciplinary proceedings reason that “[t]he First- Amendment’s protection of internal religious disciplinary proceedings would be meaningless if a parishioner’s accusation that was used to initiate those proceedings could be tested in a civil court.*’ Hiles v. Episcopal Diocese of Mass., 437 Mass. 505, 773 N.E.2d 929, 937 (2002).
In essence, respondents argue that immunity from defamation suits based on statements made during church disciplinary proceedings must necessarily be included within a church’s First Amendment right to make membership decisions, lest that right ring hollow. Respondents stress that this is particularly true because exposing these -proceedings and their participants to civil litigation will lead to a chilling effect. If church disciplinary proceedings are not shielded from the scrutiny of civil courts, there is a very real risk that those who participate will censor themselves in order to avoid liability or the threat of a lawsuit. See Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc., 819 F.2d 875, 880 (9th Cir.1987); Westbrook v, Penley, 231 S.W.3d 389, 400 (Tex.2007).
.In response, the Pfeils argue that the rule in,.Connor would provide sufficient protection to religious organizations- by preventing -courts from intruding into the “sacred precincts.”.. The-.Pfeils seem to interpret intruding on the “sacred precincts” to be equivalent to interpreting church doctrine. But the Pennsylvania Supreme Court did not specify what would qualify as a “sacred precinct.” In fact, the Pennsylvania Supreme Court cited Mains with approval, indicating, that our court of appeals made the . correct decision by refusing to delve into statements made during a church disciplinary proceeding because adjudicating the parishioners’ claims would have “obviously intrude[d] into the sacred precincts.” Connor, 975 A.2d at 1108 (citing Mains, 504 N.W.2d at 234). Consequently, it is quite possible that even the Connor court would bar suits based on statements made during the course of a church disciplinary proceeding.
Additionally, the Pfeils fail to address the argument that determining which statements are secular and which are religious would, itself, create an excessive entanglement with religion. Although the Pfeils argue that defamation law provides sufficient protection for statements made during the course of a church disciplinary proceeding, we find this argument unpersuasive. This litigation and the arguments on which the Pfeils rely provide evidence to the contrary. Indeed, the fact that under' Pfeils’ rule “clearly religious” statements would be immune from suit while more factually based “secular” statements would not be only exacerbates the chilling effect of which respondents warn. Such a rule could perversely ineentivize religious organizations to rely on amorphous and “doctrinal” reasons when making membership decisions in order to avoid any statements that could be construed as secular. Although not directly before us, *540 the fact that Pfeils’ rule would reward such behavior demonstrates that it would both excessively entangle the court with religion and unduly interfere with the ability of religious organizations to make decisions regarding membership and internal discipline.[11]
The Pfeils make two additional arguments in' an effort to support a statement-by-statement approach. First, they argue that the rule from Mains is itself unconstitutional because it provides an impermissible benefit to religious leaders and organizations, which is a violation of the Establishment Clause of the First Amendment. The Pfeils cite no case law in support of the proposition that shielding religious leaders and organizations from tort liability for their actions in the course of a church disciplinary proceeding would violate the Establishment Clause, and we have found none. In fact, the Pfeils’ argument appears to be .in tension with the U.S. Supreme Court’s holding in Hosanna-Tabor, which broadly exempted religious organizations from federal anti-discrimination law in the context of ministerial employment decisions on the basis of the First Amendment. — U.S. at —, 132 S.Ct. at 705-06. If the ministerial exception does not violate the Establishment Clause — and the U.S. Supreme Court clearly believes it does not — it is difficult to see how an exemption from tort liability in church disciplinary proceedings could be unconstitutional. The Pfeils’ contention that a rule barring defamation claims based on statements made during a church disciplinary proceeding violates the,Establishment Clause of the First Amendment is meritless.
Second, the Pfeils argue that an absolute bar will lead to absurd results. For instance, they suggest that a pastor could hold a church discipline meeting, accuse a parishioner of molesting children while knowing the accusation is false, and face no liability. The dissent also advances this argument, discussing a similar, although not identical, hypothetical set of facts. These concerns have merit. We would of course be troubled by any case in which statements were made with the intent of abusing the ecclesiastical abstention doctrine and avoiding liability, particularly if the statements were disseminated to individuals outside of the religious organization. See, e.g., Kliebenstein v. Iowa Conference of United Methodist Church, 663 N.W.2d 404, 408 (Iowa 2003) (concluding that a statement made as part of a church disciplinary proceeding, but also disseminated outside the church and carrying at least some secular meaning, was not immune from liability). But those facts are not before us and we leave the resolution of such a case for another day.[12]
*541 The reality, however, is that any rule that shields some individuals or organizations from liability will necessarily cause some otherwise meritorious claims to go uncompensated. It is clear that at least some statements and actions within the context of a church disciplinary proceeding are immune from liability — the Pfeils even admit as much. Certainly a claim for redress arising out of defamatory speech,is a valued and , important societal interest. But on, the facts before us — where ministers made largely religious and doctrinal allegations as part of an excommunication proceeding and only disseminated those statements to members of the congregation — “the First Amendment has struck the balance for us.” • Hosanna-Tabor, — U.S. at —, 132 S.Ct. at 710.
Finally, the dissent argues that our holding today represénts a rejection of Odenthal. That is simply not the case. The dissent reasons that because no U.S. Supreme Court case directly prohibits the adjudication-of the Pfeils’ claims, we are bound to apply neutral principles under Odenthal. The dissent concludes that our refusal to- apply neutral principles as we did in Odenthal amounts to an act of judicial policymaking on issues of immunity. But the dissent fundamentally misunderstands our holding.
Odenthal itself recognized that the Constitution prohibits courts from engaging in inquiries that cause “excessive entanglement” with religion. See Odenthal, 649 N.W.2d at 436-38. The U.S. Supreme Court reaffirmed this understanding in Hosanna-Tabor when it held that courts may not “interfere[ ] with an internal church decision that affects the faith and mission of the church itself.” Hosanna-Tabor, — U.S. at —, 132 S.Ct. at 707. Today, we hold that adjudicating a defamation claim based on statements -made during a church disciplinary proceeding and published only to members of the religious organization and its hierarchy would “interfere!] with an internal church decision that affects the faith and mission of the church itself,”’ id., and would excessively entangle the courts with religion. See Odenthal, 649 N.W.2d at 435-38. As a result, such án adjudicátion is prohibited by the First Amendment. Hosanna-Tabor, — U.S. at —, 132 S.Ct. at 707; see Odenthal, 649 N.W.2d at 435-38.
The absence of a U.S. Supreme Court decision directly on point with the decision we reach today does not constrain our ability to interpret the First Amendment in light of the cases' the U.S. Supreme Court has decided. The U.S. Supreme Court’s silence should not be interpreted as affirmative permission for courts to adjudicate these sorts of cases. Further, our holding does not represent a rejection of Odenthal. Rather, we simply recognize that adjudicating a defamation claim based on statements made during the course of a church disciplinary proceeding and published exclusively to members of the religious organization and its hierarchy necessarily fosters an excessive entanglement with religion, interferes with a religious organization’s ability to make decisions that affect its faith and' mission, and precludes the application of neutral principles of law.
Finally, our decision today is not an act of judicial policymaking. Rather, we conclude that the Pfeils’ claims are barred as a matter of constitutional law, something very different than judicially created or statutorily enacted immunities. The im *542 munity cases cited by the dissent involve circumstances in which the court was called upon to balance society’s interest in providing a remedy to private citizens with its interest in providing immunity to certain groups or individuals. Although we take the dissent’s point that some interests weigh against granting absolute immunity, “the First Amendment has struck the balance for us” -in this case. Hosanna-Tabor, — U.S. at —,132 S.Ct. at 710.
The law places a premium on providing "remedies to those injured. Sometimes, however, the courts cannot award a remedy, no matter how valid the claim. These are not easy decisions. But they are necessary decisions, particularly where, as here, the right to a remedy must be weighed against constitutionally enshrined commitments to religious freedom. We conclude that adjudicating Pfeils’ claims would excessively entangle the courts with religion and unduly interfere with respondents’ constitutional right to make autonomous decisions regarding the governance of their religious organization.
IV.
In summary, we agree with respondents insofar as they argue that applying the issue-by-issue approach advocated. by the Pfeils. to this case would foster an excessive entanglement with religion, unduly interfere with the internal governance decisions of religious organizations, and violate the First Amendment. Ultimately, adjudicating Pfeils’ claims would excessively entangle the courts with religion and unduly interfere with respondents’ constitutional right to make autonomous decisions regarding the governance of their religious'' organization. We hold that the First Amendment prohibits holding an individual or organization liable for statements made in the context of a religious disciplinary proceeding when those statements are disseminated only to members of the church congregation or the organization’s membership or hierarchy. As a result, the district court properly dismissed the claims brought by the Pfeils against St. Matthew and its pastors.
Affirmed.
HUDSON, J., not having been a member of this court at the time of Submission, took no part in the’ consideration or decision of this case.
CHUTICH, J., took no part in the-consideration or decision of this case.

. There appears to be some discrepancy with respect to the church’s proper name. Appellant indicates that, according to the Secretary of State’s office, the church’s legal name is "St. Matthews [sic] Evangelical Luthem [sic] Church of the Unaltered Augsburg Confession of Worthington, Nobles County, Minnesota.” The church is commonly referred to as "St. Matthew” and respondents have clarified that the church would prefer to be identified as "St. Matthew.”

. Because this case was resolved on a Rule 12 motion to dismiss, the facts recited here are drawn from the Pfeils’ Second Amended Complaint.

. Henry Pfeil died in April 2012. After La-Vonne Pfeil filed suit, the district court named her trustee for: Henry Pfeil’s claims, and the complaint was amended to reflect this change. Although only LaVonne Pfeil ap *532 pears here, we refer to the Pfeils collectively in this opinion for convenience.

. Previously, respondents moved to dismiss for failure to state a claim under Minn. R. Civ. P. 12.02(e), arguing that the Pfeils did not plead the. defamatory statements with sufficient detail and that Henry Pfeil’s claims did not survive his death. The Pfeils countered by opposing the motion, moving to amend their complaint, and submitting a second amended complaint for the district court's consideration. The court granted the Pfeils’ motion to amend their complaint; granted respondents’ motion to dismiss with respect to Henry Pfeil’s claims, finding that they did not survive his death; and denied respondents' motion with respect to LaVonne Pfeil’s claims, finding that they were pleaded with sufficient detail. None of these rulings are before us because they were not appealed or argued to this court and the court of appeals resolved the case solely on First Amendment grounds.

. The Pfeils brought claims for defamation against Braun, Behnke, and St. Matthew. They also brought a negligence claim against ‘ St. Matthew, alleging that St. Matthew negligently allowed the defamation to occur. Because all of these claims have their factual basis in the allegedly defamatory statements made during church disciplinary proceedings, we analyze them together and generally refer to the defamatory statements as the basis for the Pfeils’ claims.

. Watson was a pre-Erie diversity case and was decided on the básis of federal common law, not the First Amendment. See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 115-16, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Subsequently, however, Kedroff enshrined Watson 's theory of deference as a constitutional doctrine by grounding Watson! s holding in the First Amendment, Id. Milivojevich represents the first time the Court addressed the doctrine post-Kedroff and clearly constitutionalized the idea that the decisions of religious tribunals should be afforded significant deference under the First Amendment. '

. The court did allow the pastor to pursue a sexual-harassment claim based on the conduct of another pastor at the church because that claim was not based on the church’s decision to terminate her employment and because that claim was unrelated to pastoral qualifications or issues of church doctrine. Snyder, 471 N.W.2d at 720-21.

. 1 Respondents also contend that the Pfeils’ claims are barred by the Freedom of Conscience Clause in Article I, section 16 of the, Minnesota Constitution. Respondents did not raise this argument below. This court does not typically consider constitutional - issues that were not raised in the district court. In re Welfare of C.L.L., 310 N.W.2d 555, 557 (Minn.1981). At oral argument, respondents contended that the court should address their argument under the Minnesota Constitution because claims regarding subject matter jurisdiction cannot be waived. See Dead Lake Ass’n v. Otter Tail Cty., 695 N.W.2d 129, 134 (Minn.2005). Because we decide that the ecclesiastical abstention doctrine does not create a jurisdictional bar, we decline to reach respondents’ arguments under the Minnesota Constitution — those arguments have been forfeited. See In re Welfare of C.L.L., 310 N.W.2d at 557.

. See Hutchison v. Thomas, 789 F.2d 392 (6th Cir.1986); Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church in Am., 860 F.Supp. 1194 (W.D.Ky.1994); Farley v. Wisc. Evangelical Lutheran Synod, 821 F.Supp. 1286 (D.Minn.1993); Higgins v. Maher, 210 Cal.App.3d 1168, 258 Cal.Rptr. 757-(1989); O’Connor v. Diocese of Honolulu, 77 Hawai'i 383, 885 P.2d 361 (1994); Joon Ki Lee v. Byeong Ho Son, No. 1-11-3217, 2012 WL 6962978 (Ill.Ct.App. Sept. 28, 2012); Stepek v. Doe, 392 Ill.App.3d 739, 331 Ill.Dec. 246, 910 N.E.2d 655 (2009); Purdum v. Purdum, 48 Kan.App.2d 938, 301 P.3d 718 (2013); Hiles v. Episcopal Diocese of Mass., 437 Mass. 505, 773 N.E.2d 929 (2002); Brady v. Pace, 108 S.W.3d 54 (Mo.Ct.App,2003); Howard v. Covenant Apostolic Church, Inc., 124 Ohio App.3d 24, 705 N.E.2d 385 (1997); Ausley v: Shaw, 193 S.W.3d 892 (Tenn.Ct.App.2005); Anderson v. Watchtower Bible & Tract Soc'y of N.Y., Inc., No. M2004-01066-COA-R9CV, 2007 WL 161035 (Tenn.Ct.App. Jan. 19, 2007); Westbrook v. Penley, 231 S.W.3d 389 (Tex.2007).

. See Drevlow v. Lutheran Church, Mo. Synod, 991 F.2d 468 (8th Cir.1993); Kavanagh v. Zwilling, 997 F.Supp.2d 241 (S.D.N.Y.2014); Klagsbrun v. Va’ad Harabohim of Greater Monsey, 53 F.Supp.2d 732 (D.N.J.1999); McAdoo v. Diaz, 884 P.2d 1385 (Alaska 1994); Marshall v. Munro, 845 P.2d 424 (Alaska 1993); Lipscombe v. Crudup, 888 A.2d 1171 (D.C.2005); Cargill v. Greater Salem Baptist Church, 215 S.W.3d 63 (Ky.Ct.App.2006); Ciganik v. York, No. 2013-P-0018, 2013 WL 6881611 (Ohio Ct.App. Dec. 31, 2013); Connor v. Archdiocese of Phila., 601 Pa. 577, 975 A.2d 1084 (2009); Banks v. St. Matthew Baptist Church, 406 S.C. 156, 750 S.E.2d 605 (2013); Bowie v. Murphy, 271 Va. 127, 624 S.E.2d 74 (2006).

. We also reject the dissent's suggestion that a qualified privilege would sufficiently protect participants in a church disciplinary proceed-ing. Although a qualified privilege would provide greater protection than the rule advocated by appellants, it would still be insufficient. A qualified privilege only protects statements if the privilege is not "abused.” Lewis v. Equitable Life Assurance Soc’y of the U.S., 389 N.W.2d 876, 890 (Minn.1986). "[Tjhe question of whether [a qualified] privilege was abused is a jury question.” Id. Consequently, determining whether a statement is entitled to the protection of a qualified privilege requires ■ extensive litigation. Thus, although a qualified privilege would provide some protection on the ultimate question of liability, it would do little, to ameliorate the chilling effect that the specter of litigation can create. See discussion supra at 538-39.

. The dissent criticizes our failure to clarify how this rule of law would apply to various hypothetical facts. Although we recognize the dissent's concerns regarding future cases, it would be inappropriate to speculate on how the First Amendment may apply to hypothetical facts that are not before us. Those decisions must be left for another, properly presented, case ór controversy. We hold only *541 that, on the facts before us, adjudicating the Pfeils’ claims would violate the First Amendment.