DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DIOCESE OF PALM BEACH, INC.,**
Petitioner,

v.

**FATHER JOHN GALLAGHER,**
Respondent.

No. 4D17-2579

[ May 9, 2018 ]

Petition for Writ of Prohibition to the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Meenu Sasser, Judge; L.T. Case No. 50-2017-CA-000337-XXXX-MB.

J. Patrick Fitzgerald and Associates, and J. Patrick Fitzgerald, Roberto Diaz, and Maura F. Jennings, and Gaebe, Mullen, Antonelli & DiMatteo, and Elaine D. Walter and Michael A. Mullen, for petitioner.

Babbitt & Johnson, P.A., and Theodore Babbitt, and Burlington & Rockenbach, P.A., and Philip M. Burlington and Nichole J. Segal, for respondent.

LUCK, R., Associate Judge.[1]

Father John Gallagher, a Catholic priest, sued the diocese in which he served, the Diocese of Palm Beach, Inc., for defamation. The diocese moved to dismiss the complaint based on the ecclesiastical abstention doctrine, which prevents civil courts from deciding matters that require adjudication of theological controversy, church discipline, ecclesiastical government, and the conformity of the members of the church to the standard of morals required of them. The trial court denied the dismissal motion, declining to apply the ecclesiastical abstention doctrine because Father Gallagher's defamation claims could be resolved based on neutral legal principles without entangling the courts in the interpretation and

---

[1] The Florida Supreme Court directed that this petition be reviewed and determined by a panel of judges from the Third District Court of Appeal sitting by designation as associate judges of the Fourth District Court of Appeal.

application of church law, policies, and practices.  We disagree, and grant the diocese's petition for writ of prohibition, because Father Gallagher's defamation claim, which arises out of an employment dispute between him and the diocese, cannot be resolved without the courts excessively entangling themselves in what is essentially a religious dispute.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Father Gallagher was ordained as a priest in the Catholic Church on June 21, 1992.  He first served in his homeland of Northern Ireland, later immigrating to the United States.  In 2000, Father Gallagher was incardinated with the Diocese of Palm Beach.  Father Gallagher held the following positions with the diocese:

- Sept. 1, 2000—Aug. 1, 2002:  Parochial vicar at St. Anastacia Church, Ft. Pierce

- Aug. 1, 2002—June 30, 2005:  Parochial vicar at the Cathedral of St. Ignatius Loyola, Palm Beach Gardens

- July 1, 2005—Sept. 30, 2009:  Parochial vicar at St. Joan of Arc Church, Boca Raton

- Oct. 1, 2009—July 12, 2012:  Special leave to study[2]

- Dec. 1, 2013—June 30, 2014:  Parochial vicar, Holy Name of Jesus Church, West Palm Beach

- July 1, 2014—June 30, 2015:  Parochial administrator, Holy Name

- July 1, 2015—present:  Special leave.

Father Gallagher began his association with the Holy Name of Jesus Church in December 2013 when he was assigned to that parish as parochial vicar.[3] On April 14, 2014, Father Gallagher was named parochial

---

[2]  Father Gallagher sought but was not assigned as pastor of St. Joan of Arc parish in 2009.  With the diocese's permission, he took leave to take additional pastoral studies, and returned to ministry in December of 2013.

[3]  The Code of Canon Law of the Catholic Church delineates the officials charged with care of the faithful in a parish. The pastor is the primary shepherd of the parish, and is generally appointed to the office for an indefinite term by the bishop.  Parochial vicars are co-workers with the pastor of a parish and are assigned to assist in exercising pastoral ministry in the parish.  The office of

administrator of Holy Name. In December of that year, Father Joseph Palimattom, a priest from India, was assigned to assist Father Gallagher as parochial vicar. Father Palimattom had not been with the church a month when the incident sparking the controversy between Father Gallagher and the diocese occurred.

On the evening of January 5, 2015, Father Gallagher received a text message from the church's music minister. A 14-year old boy complained to the music minister that Father Palimattom had shown him numerous photographs containing child pornography. The matter was referred to the Palm Beach County sheriff's office, who arrested Father Palimattom. As a result of the investigation, Father Palimattom pleaded guilty to possessing and showing pornography to a minor, was briefly incarcerated, and subsequently deported to India.

After the incident, Father Gallagher was reassigned from Holy Name. Diocese officials met with Hispanic members of Holy Name who were dissatisfied with how they were treated by Father Gallagher. The diocese personnel committee, in May 2015, discussed Father Gallagher's assignment. Ultimately, the bishop decided not to offer Father Gallagher the office of pastor to Holy Name, but instead to transfer him to another parish. Father Gallagher did not accept the transfer and instead took leave.

Father Gallagher believed that the diocese attempted to cover-up the sexual abuse incident, and that his reassignment was intended as punishment for not going along with the cover-up. Father Gallagher initially complained to Catholic Church officials. When this was unsuccessful, Father Gallagher went to the Irish media.

Father Gallagher told an interviewer on Irish radio that he exposed the workings of the diocese and Vatican and their lack of transparency in complying with policies and procedures in exposing pedophiles. Father Gallagher said of the Church that it had proven it did not have integrity, honor, and a moral compass to self-police, and the powers-that-be are corrupt all the way through to the bishop. The Church, Father Gallagher said, had a corporate mindset, and as the oldest government in the world its corruption was unique to itself. Father Gallagher explained that he

---

parochial administrator is the same as that of the pastor, but is usually a temporary position when the office of pastor is vacant. The bishop may later appoint the parochial administrator as pastor if the bishop deems the administrator qualified for the office.

was being attacked for exposing the crime and had the full wrath of the diocese.

In response, a number of diocese officials commented about Father Gallagher publicly to parishioners and the local press. The diocese's response is the basis for Father Gallagher's defamation complaint.

Father Gallagher claimed the diocese defamed him in newspaper articles, letters to parishioners which were read at masses, press statements posted on the diocese webpage, electronic mail among diocese personnel, and postings on diocese personnel's social media. These statements, Father Gallagher alleged, defamed him by calling him a liar,[4] unfit to be a priest,[5] and in need of professional help.[6]

---

[4] For example: (1) on January 26, 2016, in a Facebook post, the bishop's episcopal secretary said that Father Gallagher "is blatantly lying in his flawed 'recollection' of the facts," and "has managed to manipulate [a sex abuse interest group] in the web of lies that he continues to spread"; (2) the same day, in a Facebook post, the diocese lawyer said that Father Gallagher, "through a complete misrepresentation of the case of Father Jose Palimattom, has brought unfair and slanderous allegations against the Church"; (3) the same day, in electronic mail, the diocese chancellor was reported as saying that Father Gallagher's allegations are "untrue," and that he had "a history of problems for years and has been a troublemaker"; (4) on January 29, in a letter to parishioners, the bishop said Father Gallagher had made "unfounded allegations" and this was "another one of his fabrications which is causing harm to the Church"; and (5) on February 5, in an article in the *Sun Sentinel*, the bishop was reported to have said that Father Gallagher was "blatantly lying," made "unfounded allegations," and "erroneously assert[ed] [the diocese] tried to 'cover up' the inappropriate behavior of a visiting priest."

[5] For example: (1) on January 26, in a Facebook posting, the diocese lawyer said that Father Gallagher "has acted in a similar manner in other situations in the past"; (2) on January 26, in electronic mail, the diocese chancellor was reported as saying Father Gallagher "has a lot of rich people on his side because he has been doing them a lot of favors like remarrying without annulment"; and (3) on January 31, in an article in the *Palm Beach Post*, church personnel were reported as saying Father Gallagher was "spread[ing] lies about the Diocese because he was passed over for a promotion for at least a second time in six years," he "harass[ed] a Cuban priest . . . prompting Hispanic parishioners to demand Gallagher's transfer," and he was "very upset and angry that he was not named pastor."

[6] For example: (1) on January 26, in a Facebook posting, the diocese lawyer said that Father Gallagher "is in need of professional assistance"; (2) on January 28, in an article in the *Irish Central*, the diocese is reported as saying "Father Gallagher ... is in need of professional assistance"; and (3) on January 31, in an

In his complaint, Father Gallagher claimed that as a result of these defamatory statements, he "was damaged in his reputation and his livelihood," "his ability to serve in his chosen profession as a priest has been greatly diminished or eliminated," "[h]e has lost both past and future income and the ability to earn money in the future," and "he has suffered mental and physical pain and suffering . . . aggravation of a preexisting condition . . . [and the] ability to lead and enjoy a normal life." Father Gallagher demanded both compensatory and punitive damages.

The diocese responded to the complaint by filing a motion to dismiss based on the ecclesiastical abstention doctrine. In its motion, the diocese argued that Father Gallagher's claim, although pleaded as a defamation claim, was "equivalent to a wrongful discharge or employment retaliation case." The resolution of the claim, the diocese argued, would require the trial court to consider questions of internal church governance, which was barred by the ecclesiastical abstention doctrine. After briefing, the trial court denied the motion to dismiss because, it said, it could decide whether defamation occurred applying neutral principles of law "without inquiry into religious doctrine."

The diocese petitioned for a writ of prohibition.

## DISCUSSION

"Prohibition lies where a petitioner has demonstrated that a trial court lacks subject matter jurisdiction over a lawsuit. It has been invoked successfully in cases in which a party challenges a court's subject matter jurisdiction to entertain a dispute involving a religious doctrine." *House of God Which Is the Church of the Living God, the Pillar & Ground of the Truth Without Controversy, Inc. v. White*, 792 So. 2d 491, 492 (Fla. 4th DCA 2001) (citations omitted).

*Ecclesiastical Abstention Doctrine.*

> The church autonomy doctrine, or ecclesiastical abstention doctrine, prevents civil courts from deciding matters that require adjudication of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," *Watson v. Jones*, 80 U.S. 679, 733 (1871) . . . .

---

article in the *Palm Beach Post*, Pastor Rodriguez said Father Gallagher "needs serious professional help."

5

The doctrine, which has roots in both the free exercise and establishment clauses of the United States Constitution, U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"), has its core application in cases where a court intrudes on a church's autonomous management of its own internal affairs and property, thereby either burdening or inhibiting the exercise of religious freedom (free exercise clause) or fostering an excessive government entanglement with religion (establishment clause).

*Flynn v. Estevez*, 221 So. 3d 1241, 1245-46 (Fla. 1st DCA 2017) (footnotes omitted).

The doctrine "precludes courts from exercising jurisdiction where an employment decision concerns a member of the clergy or an employee in a ministerial position." *Archdiocese of Miami, Inc. v. Minagorri*, 954 So. 2d 640, 641 (Fla. 3d DCA 2007).

Courts may not consider employment disputes between a religious organization and its clergy because such matters necessarily involve questions of internal church discipline, faith, and organization that are governed by ecclesiastical rule, custom, and law. Whether an individual is qualified to be a clergy member of a particular faith is a matter to be determined by the procedures and dictates of that particular faith.

. . . .

The interaction between a church and its pastor is an essential part of church government. . . . Thus, civil courts must abstain from deciding ministerial employment disputes . . . , because such state intervention would excessively inhibit religious liberty.

*SE Conference Ass'n of Seventh-Day Adventists, Inc. v. Dennis*, 862 So. 2d 842, 844 (Fla. 4th DCA 2003) (citations and quotations omitted). "[T]he relationship between an organized church and its ministers is its lifeblood. . . . Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *Malichi v. Archdiocese of Miami*, 945 So. 2d 526, 529 (Fla. 1st DCA 2006) (omission in original) (quoting *McClure v. Salvation Army*, 460 F.2d 553, 558-59 (5th Cir. 1972)).

However, "[t]he subject of a priest's employment relationship with his church is not *per se* barred by the church autonomy doctrine." *Id.*

> [C]ourts have held that the application of a neutral law that does not require inquiry into or resolution of an ecclesiastical matter may be permissible . . . . Simply because a church is involved as a litigant does not make the matter a religious one; instead, inquiry must be made [1] as to the nature of the dispute and [2] whether it can be decided on neutral principles of secular law without a court intruding upon, interfering with, or deciding church doctrine.

*Flynn*, 221 So. 3d at 1247.

The nature of Father Gallagher's dispute with the diocese is defamation, which requires him to allege and prove the defamatory statement was published, it was false, the person who said it must have been acting "with knowledge or reckless disregard as to the falsity," and Father Gallagher suffered actual damages as a result of the statement. *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008). As in *Flynn*, we must ask whether Father Gallagher's defamation claim can be decided on neutral principles of secular law; or, is this a ministerial employment dispute that would require the courts to get excessively entangled in issues of internal church discipline, faith, and organization that are governed by ecclesiastical rule, custom, and law.

*Actual Damages*

Father Gallagher's complaint asked for compensatory and punitive damages because the diocese's defamation diminished or eliminated his ability to serve in his chosen profession as a priest, and damaged his livelihood. Father Gallagher also requested actual damages because the defamation caused him to lose past income and his ability to earn future income.

Deciding Father Gallagher's claim for actual damages would require the courts to delve into why Father Gallagher was not promoted to pastor, and was reassigned to another parish. This would require the court to question the diocese's employment decision to hire, retain, or discipline Father Gallagher – a member of the diocese – and the reasoning behind its decision.

7

The Third District has affirmed the dismissal of a similar claim in *Goodman v. Temple Shir Ami, Inc.,* 712 So. 2d 775 (Fla. 3d DCA 1998).[7] There, as here, a religious leader (a rabbi) sued his congregation and a member of the board of directors for defamation. *Id.* at 776. The board of directors decided not to renew the rabbi's contract because "of disagreement about religious concepts," and an investigation by one of the board members which revealed that the rabbi had struck a senior rabbi while employed at another synagogue in Chicago, and then later unjustly sued the Chicago synagogue. *Id.* at 776-77.

The trial court dismissed the defamation claim based on the ecclesiastical abstention doctrine, and the Third District affirmed:

> In order for the trial court to have resolved these disputes, it would have had to immerse itself in religious doctrines and concepts and "determine" whether the religious disagreements were a "valid" basis for the termination of Rabbi Goodman's services. The allegedly defamatory report . . . occurred as part of this religious dispute and would require the trial court to weigh their effect on the board members as compared to the effects of the other considerations which clearly are religious disagreements.

*Id.* at 777.

Here, too, to resolve Father Gallagher's actual damages claim, the courts would have to determine whether the diocese's reasons for not making him a pastor, and reassigning him to another church, were valid religious reasons concerning Father Gallagher's fitness for the job, or retaliation for Father Gallagher's whistleblowing. Like the *Goodman* court, we would be required to weigh the effect of Father Gallagher's problems with his Hispanic congregants on the advisory committee's decision to pass over Father Gallagher for the position of pastor, and whether this was a valid religious reason for the diocese's decision. As the *Goodman* court explained, "[i]nquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader is not a proper task for a civil court." *Id.*

---

[7] We cited approvingly to *Goodman* in affirming the dismissal of a defamation claim in *Kond v. Mudryk,* 769 So. 2d 1073, 1078 (Fla. 4th DCA 2000) ("Lastly, we affirm the trial court's dismissal of appellants' claims for slander. We agree with the trial court's conclusion that 'an adjudication of such claims would result in excessive government entanglement with church policies, procedures, practices, and bylaws,' contrary to the First Amendment. *See Doe,* 718 So. 2d at 288; *Goodman,* 712 So. 2d at 777.").

8

We are not permitted to look behind the diocese's ministerial employment decision because doing so would necessarily entangle us in questions about the religious reasons why Father Gallagher was not promoted under canonical law.

Also problematic is Father Gallagher's demand for front- and backpay and compensatory and punitive damages. Such an award would be a penalty for the diocese exercising its right to determine which priests to promote and assign to its parishes. The courts would be required to intrude excessively in the diocese's ministerial employment decisions by finding that Father Gallagher's non-promotion and reassignment were done for improper reasons. As the Supreme Court explained in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012), a case involving a claim of improper termination of a school minister:

> [The minister] no longer seeks reinstatement, having abandoned that relief before this Court. But that is immaterial. [The minister] continues to seek frontpay in lieu of reinstatement, backpay, compensatory and punitive damages, and attorney's fees. An award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination. Such relief would depend on a determination that [the Church] was wrong to have relieved [the minister] of her position, and it is precisely such a ruling that is barred by the ministerial exception.

*Id.* at 194 (citation omitted).[8] The courts, here, are similarly barred from penalizing the diocese and determining the diocese was wrong for deciding Father Gallagher was not the right clergyman for Holy Name.

*Falsity*

Father Gallagher's complaint also alleged that he was defamed by the diocese's statements that he was unfit to serve as a priest and needed professional help. As part of the defamation claim, the courts would have to determine whether these claims were false.

---

[8] The ministerial exception is a close cousin to the ecclesiastical abstention doctrine. "The doctrine has parallels to the 'ministers exception' with which it shared the common feature of allowing churches to exercise their religious freedoms without governmental interference into its internal affairs." *Flynn*, 221 So. 3d at 1246.

Determining the falsity of whether Father Gallagher was unfit to serve gets the court excessively entangled in Catholic Church doctrines and canonical law. The falsity question turns on whether Father Gallagher was doing what he was supposed to be doing as a priest and parochial administrator at Holy Name. In his interactions with parishioners, fellow priests, and the diocese hierarchy, was Father Gallagher following Church canons and teachings? Father Gallagher says yes; the diocese says no.

We do not need to answer the question because asking it requires us to determine the duties assigned to a priest that make him fit to serve, and whether Father Gallagher was qualified to do the job. A determination of a priest's duties and whether he is qualified to serve are uniquely decisions of the diocese, and would excessively entangle us in questions of religious administration and government, and the procedures and dictates of the Catholic faith. *See Malichi*, 945 So. 2d at 531 ("Determination of a priest's duties is a matter of the church's internal administration and government."); *Dennis*, 862 So. 2d at 844 ("Whether an individual is qualified to be a clergy member of a particular faith is a matter to be determined by the procedures and dictates of that particular faith.").

We have the same entanglement problem with the falsity of the diocese's statement that Father Gallagher was in need of professional help. The diocese imposed the requirement that Father Gallagher receive professional help as a necessary disciplinary step for him to resume his "priestly ministry." ("As always, [Father Gallagher] will be given every opportunity for appropriate priestly ministry, based on his willingness to tell the truth, accept assistance, and apologize for the harm he continues to cause." "Father Gallagher has acted in a similar manner in other situations in the past and has been given every opportunity for correction, including the possibility of professional assistance.")

Whether Father Gallagher was actually in need of professional help is beside the point. As we have explained, "[t]he church authorities and such tribunals as they may set up for themselves are supreme in all spiritual matters and may arbitrarily expel from membership any individual with or without cause, as long as no civil rights are involved. . . . This is true, whether the expulsion of the individual be in disregard of the usage and practice of the church, or not." *Kond*, 769 So. 2d at 1076 (quoting *Partin v. Tucker*, 172 So. 89, 92-93 (Fla. 1937)). What is true for expulsions and excommunications is just as true for lesser disciplinary decisions like requiring a church member or clergy to seek professional help. Reviewing the falsity of whether Father Gallagher needed professional help will excessively entangle the courts in determining whether the diocese

correctly imposed this disciplinary step on Father Gallagher, and whether the diocese followed its disciplinary practices and procedures. *See Flynn*, 221 So. 3d at 1245 ("The . . . ecclesiastical abstention doctrine[] prevents civil courts from deciding matters that require adjudication of . . . church discipline . . . ." (quotation omitted)).

## CONCLUSION

To repeat, not every church-priest dispute is shielded by the ecclesiastic abstention doctrine. *Malichi*, 945 So. 2d at 529 ("The subject of a priest's employment relationship with his church is not *per se* barred by the church autonomy doctrine."). Where the "dispute can be resolved by applying neutral principles of law without inquiry into religious doctrine and without resolving a religious controversy, the civil courts may adjudicate the dispute." *Dennis*, 862 So. 2d at 844. Where, though, the dispute implicates internal church discipline, faith, organization, and ecclesiastical rule, custom, and law, "the civil courts must abstain from deciding" it "because such state intervention would excessively inhibit religious liberty." *Id.* (quotation omitted).

Father Gallagher's complaint that the diocese's statements were false and resulted in actual damages cannot be decided on neutral principles. These claims would entangle the courts in the diocese's ministerial staffing decisions, the interpretation and application of canons and doctrines, and Church discipline, which the civil courts must abstain from reviewing and deciding. We grant the petition for writ of prohibition on Father Gallagher's defamation complaint, and quash the trial court's order, but withhold formal issuance of the writ confident the trial court will dismiss the complaint based on the ecclesiastical abstention doctrine.

LAGOA, B. and SCALES, E., Associate Judges, concur.

\*         \*         \*

***Not final until disposition of timely filed motion for rehearing.***

11