# IN THE SUPREME COURT OF TEXAS

═══════════

No. 20-0127

═══════════

IN RE DIOCESE OF LUBBOCK, RELATOR

═══════════════════════

ON PETITION FOR WRIT OF MANDAMUS

═══════════════════════

**Argued January 6, 2021**

JUSTICE DEVINE delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE BLACKLOCK, JUSTICE BUSBY, JUSTICE BLAND, and JUSTICE HUDDLE joined.

JUSTICE BLACKLOCK filed a concurring opinion.

JUSTICE BOYD filed a dissenting opinion.

The ecclesiastical abstention doctrine prohibits civil courts from delving into matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 714 (1976) (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1871)). The doctrine is grounded in the First Amendment, which protects the right of religious institutions "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952).

In this original mandamus proceeding, the Diocese of Lubbock, as relator, asserts that ecclesiastical abstention prohibits the trial court from assuming jurisdiction over a suit brought by one of its ordained deacons against the Diocese and that the trial court should have therefore granted the Diocese's plea to the jurisdiction. The suit arises out of an internal investigation by the Diocese into its own clergy, the inclusion of the deacon's name on a list of its clergy credibly accused of sexual abuse of a minor, and the Diocese's public statements regarding the list and church reforms following its release to the Diocese's public website. The deacon maintains that he has never sexually abused a child and that the Diocese defamed him by publicly implying that those on the list were indeed guilty of such abuse.

The court of appeals denied the Diocese's petition for mandamus relief, concluding that the Diocese's investigation lost ecclesiastical protection when it went beyond church walls and related to an issue—sexual abuse—that is not strictly and purely ecclesiastical. 592 S.W.3d 196 (Tex. App.—Amarillo 2019). Under the First Amendment, however, courts must abstain from exercising civil jurisdiction over claims that require them to "resolve a religious question" or "impede the church's authority to manage its own affairs." *Westbrook v. Penley*, 231 S.W.3d 389, 397 (Tex. 2007). We conclude that the substance and nature of the deacon's claims against his church will necessarily require the trial court to evaluate whether the Diocese properly applied Canon Law and are inextricably intertwined with the Diocese's internal directive to investigate its clergy. That is, the deacon's claims relating to the Diocese's publication and communication of the results of its investigation cannot be severed from its policy to investigate its clergy in the first place. Thus, we conditionally grant the Diocese's petition for writ of mandamus and direct the trial court to dismiss the deacon's underlying lawsuit.

## I.    Background

Jesus Guerrero was ordained as a deacon of the Diocese of Lubbock in 1997. Deacons are ministers in the Catholic Church, authorized to baptize parishioners, assist the priest at Mass, preach homilies, celebrate weddings, and conduct funeral rites. In 2003, the Diocese temporarily suspended Guerrero's diaconal faculties after receiving reports of sexual misconduct involving Guerrero and a woman with a history of mental and emotional disorders. Upon completion of an investigation, the Bishop of the Diocese indefinitely suspended Guerrero's diaconal faculties and privileges. In July 2006, the Diocese granted Guerrero's request for reinstatement of his diaconal faculties. However, a new allegation and subsequent investigation of sexual misconduct involving Guerrero and the same woman led Bishop Placido Rodriguez to permanently withdraw Guerrero's diaconal faculties in November 2008. Although Guerrero may no longer perform sacramental functions, he was not laicized and remains an ordained deacon.

The Texas Catholic Church consists of fifteen dioceses, each led by a bishop. Each diocese uses its own website to communicate with its members. In September 2018, to assist victims of abuse and improve transparency with Catholics in all the Texas Dioceses, the Catholic Bishops of Texas decided to release the names of those clergy against whom credible allegations of sexual abuse of a minor have been raised. After the individual dioceses completed a review of their files and compiled their lists, the respective lists were posted on each diocese's website on January 31, 2019, along with an accompanying statement.

Guerrero's name was included on the Lubbock Diocese's list. The list, entitled "Names of All Clergy with a Credible Allegation of Sexual Abuse of a Minor," stated its purpose and the process of determining who belonged on the list; it also invited others to report any sexual abuse

3

experiences to the Diocese. The list included names of priests or clergy against whom a "credible allegation" had been made since the Lubbock Diocese's inception in June 1983. A priest or clergy had a "credible allegation" of sexual abuse of a minor if "after review of reasonably available, relevant information in consultation with the Diocesan Review Board or other professionals, there is reason to believe [it] is true." To prepare the list, the Diocese's attorney "engage[d] the services of a retired law enforcement professional and a private attorney to review all clergy files for any credible allegations of abuse of minors." The list, as originally published, did not include the canonical meaning of the term "minor," which the Diocese asserts—under Canon Law—includes "a person who habitually lacks the use of reason" and encompasses any "person deemed vulnerable due to a health or mental condition."

The Diocese issued a news release the same day that it published the list. The news release stated the Lubbock Diocese joined the other Texas Dioceses "to release names of clergy who have been credibly accused of sexually abusing a minor, going back at least to 1950 or to the year of the establishment of the [D]iocese." The decision to release the list "was made in the context of [the Church's] ongoing work to protect children from sexual abuse" and "to promote healing and a restoration of trust in the Catholic Church." Bishop Robert Coerver explained in a letter that the Diocese released the names as part of a broader, good-faith effort to restore the trust and confidence of its membership and because the Diocese is "serious about ending the cycle of abuse in the Church and society at large."

A local news station interviewed Chancellor Marty Martin, the Lubbock Diocese's principal notary and administrative manager, about the list. The report stated that while the Church had previously disclosed past incidents of sexual abuse to the authorities and to other church

members, the recent investigation stemmed from a desire to ensure that the Church was a safe environment for everybody. It quoted Chancellor Martin as saying that "the [C]hurch is safe for children."

Guerrero demanded a retraction of his name from the list. *See* TEX. CIV. PRAC. & REM. CODE § 73.055. In response, the Diocese sent Guerrero a letter explaining that the Bishops from the Texas Dioceses formulated a plan in 2018 to evaluate which of its priests and clergy had been credibly accused of sexual abuse of a minor. The Lubbock Diocese derived its plan from the Charter for Protection of Children and Young People (the Charter), which was authored by the United States Conference of Bishops. The Charter encourages more transparency within the Catholic Church around issues of sexual abuse and represents a shift in how sexual abuse within the Church is addressed. For instance, the Charter arranges review boards to assess allegations of sexual abuse of a "minor" to determine a priest's or clergy's suitability for ministry. Consistent with Canon Law, the Charter defines "minor" to include those who habitually lack the use of reason and are therefore deemed vulnerable adults. The letter also detailed some of the separate reports of sexual assault that the Lubbock Diocese had received against Guerrero. It went on to state that "[t]he adult female involved in these incidents . . . is severely bi-polar, is not allowed to drive, and may not have been on her medications at the time of the various instances which were witnessed." Based on the investigation by the Diocesan Review Board and an independent review committee, the letter concluded, the Lubbock Diocese had determined that the allegations of sexual abuse of a "minor" against Guerrero were credible, as understood by Canon Law.

Guerrero subsequently filed suit, alleging defamation and intentional infliction of emotional distress. The Diocese responded with a motion to dismiss under the Texas Citizens

Participation Act (TCPA), asserting that Guerrero's suit related to the Diocese's right to free speech. *See id.* § 27.003 The Diocese also filed a plea to the jurisdiction arguing that the ecclesiastical abstention doctrine precluded the trial court from exercising jurisdiction over the suit under the First Amendment. The trial court denied both motions. The Diocese appealed the interlocutory order denying the TCPA motion to dismiss, *see id.* § 27.008, and filed an original petition seeking mandamus relief from the order denying its plea to the jurisdiction.

The court of appeals affirmed in part and reversed in part the trial court's denial of the Diocese's TCPA motion to dismiss, *Diocese of Lubbock v. Guerrero*, 591 S.W.3d 244, 248 (Tex. App.—Amarillo 2019), and denied the Diocese's mandamus petition in a separate opinion, *In re Diocese of Lubbock*, 592 S.W.3d 196, 198 (Tex. App.—Amarillo 2019, orig. proceeding). In denying mandamus relief, the court of appeals reasoned that, once the Diocese released the list to the public, the dispute was no longer ecclesiastical because it extended beyond the church polity and involved incidents that had occurred more than nine years prior. *Id.* at 202–03. The court concluded that the Diocese's decision to post the list online, engage with the media, and release public statements indicated an intentional effort to engage externally with the public instead of internally with the church. *Id.* at 203–04. This "pivotal nuance" of intentional public engagement, the court reasoned, demonstrated the absence of an ecclesiastical matter. *Id.* at 202. The list and accompanying statements revealed the Diocese's intent to engage with society at large without "any nexus between the Diocese's conduct and any theological, dogmatic, or doctrinal reason for engaging in it." *Id.* at 204. Finally, the court rejected the Diocese's argument that the case would require a court to determine the canonical meaning of "minor" because a statement's defamatory meaning (or lack thereof) is based on "how a person of ordinary intelligence would perceive the

6

accusation." *Id.* The court of appeals determined that the list and the Diocese's accompanying statements referenced abuse of a "minor" and "children," which are terms of secular meaning and would not require consideration of any ecclesiastical meaning. *Id.* at 205.

In this Court, the Diocese petitions for review of the court of appeals' affirmance of the order denying its motion to dismiss under the TCPA and again seeks mandamus relief from the denial of its plea to the jurisdiction. We granted the Diocese's petition for review and consolidated it with the petition for writ of mandamus for argument. Because the jurisdictional issue presented in the mandamus petition is dispositive, we dismiss the cause in the accompanying TCPA appeal, *see Diocese of Lubbock v. Guerrero,* No. 20-0005, ___ S.W.3d ___ (Tex. 2021) (per curiam), and turn to the request for mandamus relief, *see BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 479 (Tex. 2017) (addressing first the issue that would deprive a court of exercising jurisdiction).

## II.    Standard of Review

Mandamus relief is appropriate when the trial court lacks jurisdiction to hear a case. *See In re Crawford & Co.*, 458 S.W.3d 920, 929 (Tex. 2015) (per curiam); *In re Entergy Corp.*, 142 S.W.3d 316, 320–21 (Tex. 2004). "Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis for the jurisdictional challenge."[1] *Westbrook*, 231

---

[1] In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), the United States Supreme Court concluded that the "ministerial exception"—a doctrine that is independent of but related to abstention and addresses employment disputes between churches and its ministers—"operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Id.* at 188, 195 n.4. Some courts have taken this to mean that the ecclesiastical abstention doctrine now operates only as an affirmative defense. *See, e.g.*, *Doe v. First Presbyterian Church U.S.A. of Tulsa*, 421 P.3d 284, 290–91 (Okla. 2017); *Pfeil v. St. Matthews Evangelical Lutheran Church of Unaltered Augsburg Confession of Worthington*, 877 N.W.2d 528, 534–35 (Minn. 2016); *St. Joseph Cath. Orphan Soc'y v. Edwards*, 449 S.W.3d 727, 737 (Ky. 2014). Other courts have continued to apply the doctrine as a jurisdictional bar after *Hosanna-Tabor*. *See, e.g.*, *Church of God in Christ, Inc. v. L.M. Haley Ministries, Inc.*, 531 S.W.3d 146, 157 (Tenn. 2017); *Diocese of Palm Beach, Inc. v. Gallagher*, 249 So. 3d 657, 661 (Fla. Dist. Ct. App. 2018); *In re St. Thomas High Sch.*, 495 S.W.3d 500, 513–14 (Tex. App.—Houston [14th Dist.] 2016, no pet.). This past term, the Supreme Court in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), reaffirmed

S.W.3d at 394. We review a trial court's ruling on a plea to the jurisdiction de novo. *Hous. Belt &*

*Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016). A court should deny a plea

to the jurisdiction when "the pleader has alleged facts that affirmatively demonstrate the court's

jurisdiction to hear the cause." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2006)

(internal quotations omitted). "If the pleadings affirmatively negate jurisdiction," however, the

plea should "be granted without affording the plaintiff[] an opportunity to replead." *Hous. Belt &*

*Terminal Ry. Co.*, 487 S.W.3d at 160 (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133

S.W.3d 217, 227 (Tex. 2004)).

### III.    Discussion

### A

The Lubbock Diocese contends that mandamus relief is appropriate because the First

Amendment forecloses the courts' jurisdiction. The First Amendment prohibits government—and

courts—from interfering with a believer's ability to observe his faith and from interfering with a

church's management of its internal affairs. *EEOC v. Cath. Univ. of America*, 83 F.3d 455, 460

(D.C. Cir. 1996); *see Kreshik v. St. Nicholas Cathedral*, 363 U.S. 190, 191 (1960) (per curiam).

Churches have a fundamental right under the First Amendment to decide for themselves, free from

state interference, matters of church governance as well as those of faith and doctrine. *Westbrook*,

231 S.W.3d at 397 (citing *Watson*, 80 U.S. at 728–29). It is a core tenet of the First Amendment

that in resolving civil claims courts must be careful not to intrude upon internal affairs of church

---

religious institutions' ecclesiastical autonomy in matters of faith, doctrine, ministry, and governance. *Id.* at 2060–61. The Court left undisturbed its pronouncement in *Watson v. Jones*, 80 U.S. 679 (1871), that those matters implicating "theological controversy, church discipline, ecclesiastical government or the conformity of the members of the church to the standards of morals required"—that is, those matters that the ecclesiastical abstention doctrine covers—relate to a court's jurisdiction to hear a case. *Id.* at 733. And *Watson* remains binding until the Supreme Court says otherwise. *See Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) (citations omitted).

governance and autonomy. *Id.* Autonomy extends to the rights of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters. *Milivojevich*, 426 U.S. at 708–09, 724–26. And it extends to a church's conclusions regarding its own ecclesiastical rules, customs, and laws. *Brown v. Clark*, 116 S.W. 360, 363 (Tex. 1909). Government action that interferes with this autonomy or risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws is therefore prohibited by the First Amendment. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993); *Kedroff*, 344 U.S. at 116; *Brown*, 116 S.W. at 363.

The First Amendment does not bar all claims against religious bodies, though. *Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996). A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or meddling in church government. *Westbrook*, 231 S.W.3d at 398–400. Under the neutral-principles methodology, "courts decide non-ecclesiastical issues such as property ownership based on the same neutral principles of law applicable to other entities, while deferring to religious entities' decisions on ecclesiastical and church polity questions." *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 596 (Tex. 2013) (internal citation omitted); *see also Westbrook*, 231 S.W.3d at 399. Although we have yet to apply the neutral-principles methodology outside church property disputes, lower courts in Texas have found them applicable in certain, narrow circumstances. *See, e.g.*, *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 624–25 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (concluding ecclesiastical abstention did not bar a suit that arose out of a church's violation of a settlement agreement, which was not an inherently ecclesiastical activity). Indeed, any

exception to ecclesiastical abstention by application of neutral principles must be narrowly drawn to avoid inhibiting the free exercise of religion or imposing secular interests on religious controversies. *Jones v. Wolf*, 443 U.S. 595, 603–05 (1979); *Milivojevich*, 426 U.S. at 710. In other words, courts should consider not only whether a neutral principle exists without regard to religion, but also whether the application of neutral principles would impose civil liability upon a church for complying with its own internal rules and regulations or resolving a religious matter. *Westbrook*, 231 S.W.3d at 400.

The Diocese argues that the ecclesiastical abstention doctrine bars Guerrero's suit because civil court intervention in this dispute would (1) impede church governance and (2) require interpretation and review of Canon Law. Guerrero, however, contends that abstention does not apply because the alleged defamatory statements are "not strictly and purely ecclesiastical in nature." According to Guerrero, the Diocese was not clear in what it meant by the term "minor" when it released its list. To Guerrero, this omission is "the crux of this case" because the surrounding context of the list suggests that the Diocese meant "child" when it said "minor." Guerrero suggests that had the Diocese explained it meant "vulnerable adult" when referring to "minor," or that it referred to minor "according to Canon Law," then the determination of whether to include him on the list may have been a strictly ecclesiastical one and therefore protected from intrusion by the First Amendment. Moreover, Guerrero contends that this is not an issue of church governance because the statements extended beyond church walls and reflect the Diocese's desire to engage with society on a social issue—sexual abuse.

**B**

In determining whether ecclesiastical abstention applies, courts will analyze whether a particular dispute is ecclesiastical or merely a civil-law controversy in which the church happens to be involved.[2] *See Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ). In making this determination, we look to the substance and nature of the plaintiff's claims. *See Patton v. Jones*, 212 S.W.3d 541, 548 (Tex. App.—Austin 2006, pet. denied). Because courts are prohibited from risking judicial entanglement with ecclesiastical matters, *see Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2069 (2020), if the substance and nature of the plaintiff's claims are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed, *Jennison v. Prasifka*, 391 S.W.3d 660, 665, 668 (Tex. App.—Dallas 2013, no pet.).

In his petition, Guerrero alleges that the Diocese defamed him by including his name on a list of clergy "credibly accused of sexual abuse of a minor," disclosing that list to the public, and discussing the list with the media. He goes on to assert that the Diocese's communications were defamatory "both in their particular details and in their main point, essence or gist," "in that they falsely state that Jesus Guerrero was and had been 'credibly accused' of sexual misconduct of [sic] a minor." Guerrero maintains that the Diocese reached its conclusion to include him on the list despite a lack of evidence supporting that conclusion, asserting that he "has never admitted to any sexual misconduct, he was not criminally charged with anything[,] and no one ever testified that Guerrero did anything inappropriate" with the woman who was the subject of the abuse allegations.

---

[2] Put differently, a church is not immune from tort liability merely because it is a church, regardless of whether a church member or non-church member brings the suit. *See, e.g.*, *Cox v. Thee Evergreen Church*, 836 S.W.2d 167 (Tex. 1992) (church member slip-and-fall claim against church); *Zion Missionary Baptist Church v. Pearson*, 695 S.W.2d 609 (Tex. App.—Dallas 1985, writ denied) (contract claim against church for unpaid balances).

He disputes whether the woman would qualify as a minor under Canon Law and whether the Diocese has credible allegations against him generally. He reiterated these claims at oral argument.

As the Lubbock Diocese explained in response to Guerrero's request for a retraction, the list arose out of and was created in accordance with the Charter—a directive authored by the United States Conference of Bishops for each diocese to investigate allegations of sexual misconduct committed by its clergy against minors. In conducting its review, and as reflected in its revised list released in April 2019, the Lubbock Diocese investigated allegations of abuse committed against "person[s] who habitually lack[] the use of reason" or those deemed "minors" under Canon Law. Evidence in Guerrero's file coupled with a two-tiered review process led the Diocese to determine that it possessed credible allegations against Guerrero of sexual abuse of a "minor." In compliance with its directive to be more "open and transparent in communicating with the public of sexual abuse of minors by clergy," it placed the list on its website—the Diocese's means of ordinary communication with its members.

To the extent that Guerrero's claims directly call into question the Diocese's investigation and conclusions that led to the creation of the list, they necessarily reach behind the ecclesiastical curtain. In *Westbrook*, we acknowledged that the plaintiff properly abandoned her defamation claim regarding the defendant's statement about her "biblical impropriety" because such a question would have required the Court to delve into the religious question of whether her behavior was biblically improper. 231 S.W.3d at 396. Resolution of the plaintiff's defamation suit would have required the Court to evaluate the meaning of biblical impropriety and whether the defendant was accurate in his conclusions. This is because "[t]rue statements cannot form the basis of a defamation complaint." *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 855 (Tex. App.—

12

Dallas 2003, no pet.) (citing *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995)). As Guerrero states in his petition, determining whether the Diocese incorrectly included his name on the list would require a court to evaluate whether the Diocese "falsely state[d] that Jesus Guerrero was and had been 'credibly accused' of sexual misconduct of [sic] a minor." However, as the Diocese informed Guerrero, it based the scope of its investigation on the canonical meaning of minor: "a person who habitually lacks the use of reason," which includes "vulnerable adults." Thus, a court would have to evaluate whether the Diocese had credible allegations against Guerrero under the canonical meaning of "minor." This would necessarily entail a secular investigation into the Diocese's understanding of the term "minor," whether a court agrees that the woman he allegedly sexually abused qualifies as a "minor" under Canon Law, and whether the allegations it possesses were sufficiently "credible." *See Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 247, 252–54 (S.D.N.Y. 2014) (holding court lacked jurisdiction over plaintiff's libel per se claim based on a church's press release that plaintiff "was found guilty by a Church court of multiple counts of sexual abuse of a minor").

This inquiry would not only cause a court to evaluate whether the Diocese properly applied Canon Law but would also permit the same court to interlineate its own views of a Canonical term. Indeed, any investigation would necessarily put to question the internal decision making of a church judicatory body. *See, e.g.*, *Whole Woman's Health v. Smith*, 896 F.3d 362, 373–74 (5th Cir. 2018) (trial court's pretrial order compelling religious organization to respond to discovery was an abuse of discretion because it would, in part, reveal internal communications and interfere with decision-making processes of the religious organization). But courts may not investigate and resolve the application of religious doctrine and practice. *See Presbyterian Church in U.S. v. Mary*

*Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) ("First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice."). And, to prevent courts from impermissibly influencing church governance, *see Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060, courts may not second-guess the decisions reached by a church judicatory body in the application of its own rule, custom, or law, *see Brown*, 116 S.W. at 363. Thus, to the extent Guerrero's suit directly challenges the Diocese's application of Canon Law in its internal governance process, the court lacks jurisdiction.

The court of appeals concluded that a "pivotal nuance" in this case is that the Diocese's communication went beyond church walls. 592 S.W.3d at 202. It reasoned that a key fact in determining whether ecclesiastical abstention applies is to whom the church communicated. *Id.* The court observed that a church publicizing "matters historically deemed ecclesiastical" undermines a church's ability to argue that the "dispute remains an internal ecclesiastical or church polity issue." *Id.* That is, the court of appeals focused primarily on the *publication* of the list without regard to the Diocese's *reason* for including Guerrero on the list. *Id.* at 202–04.

Whether a party's claims against a church are barred by ecclesiastical abstention, though, is based not on whether a publication goes beyond church walls but rather whether the substance and nature of the plaintiff's claims implicate ecclesiastical matters, including a church's internal affairs, governance, or administration. *Westbrook*, 231 S.W.3d at 396–97; *Williams v. Gleason*, 26 S.W.3d 54, 59 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). The court of appeals' distinction runs afoul of our directive in *Westbrook* that a court may not rely on neutral principles when application of those principles would impose civil liability on a church that complies with

14

its own internal governance. 231 S.W.3d at 400. The court of appeals' focus on the publication ignores the real critical nuance in this case: that Guerrero's suit is "inextricably intertwined" with the Diocese's decision to investigate its own clergy, judicial review of which would impermissibly interfere with a church's ability to regulate the character and conduct of its leaders. *Jennison*, 391 S.W.3d at 668; *see Hosanna-Tabor*, 565 U.S. at 201.

In *Westbrook*, a former church member claimed that her secular counselor—who was also her pastor—violated a secular duty of confidentiality when he disclosed to church elders information she had discussed during counseling. 231 S.W.3d at 396, 402. We concluded that ecclesiastical abstention barred the suit. *Id.* at 402–05. We reasoned that the pastor had conflicting duties, one as a secular counselor to maintain the confidentiality of his clients and the other to comply with church directives to disclose a member's conduct that may be unbecoming of the church's moral standards. *Id.* at 391–92, 402–03 ("[T]he publication about which [the former member] complains was made in the course of the church disciplinary process and communicated by [the counselor] pursuant to the requirements of that process."). In holding that the First Amendment barred adjudication of the suit, we recognized that allowing the former member's professional negligence claim to proceed would impose civil tort liability on a pastor who complied with an internal church directive and policy to disclose the relationship in a manner consistent with church teaching. *Id.* at 402 (citing *Milivojevich*, 426 U.S. at 717 (stating that "questions of church discipline and composition of the church hierarchy are at the core of ecclesiastical concern")).

Similarly, Guerrero's suit seeks to impose liability on the Diocese for complying with its directive to investigate allegations of sexual abuse of its clergy. *See Hosanna-Tabor*, 565 U.S. at

15

190 (prohibiting "government interference with an internal church decision that affects the faith and mission of the church itself"). Investigations that relate to the character and conduct of church leaders are inherently ecclesiastical. *See id.* at 201 (Alito, J., concurring) ("[B]oth the content and credibility of a religion's message depend vitally on the character and conduct of its teachers . . . . For this reason, a religious body's right to self-governance must include the ability to select, and to be selective about, those who will serve as the very 'embodiment of its message' and 'its voice to the faithful.'"). Although tort law imposes a duty not to defame or intentionally inflict emotional distress upon others, *see Hersh v. Tatum*, 526 S.W.3d 462, 465 (Tex. 2017); *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015), a civil suit that is inextricably intertwined with a church's directive to investigate its clergy cannot proceed in the courts.

And as the Diocese disclosed to Guerrero, it was acting in accord with the Charter's directive to investigate its clergy. The Diocese stated that it applied Canon Law and instituted a review process by which it would evaluate whether the allegations and evidence it possessed against its clergy were credible. It is the fruit of this investigation about which Guerrero complains, and the publications he contests merely reflect the investigative result. Bishop Coerver's official list and accompanying explanation provide general information about each clergy on the list, the Diocese's news release offered its motivation for conducting the investigation, and the accompanying news reports describe the Diocese's transition to more transparency. Thus, Guerrero's challenge to any publication is ultimately a challenge to the Diocese's underlying investigation into its own clergy and application of Canon Law. A civil court, though, is prohibited from determining whether a church properly applied its own principles and policies, *see NLRB v. Cath. Bishops of Chicago*, 440 U.S. 490, 502 (1979); *Brown*, 116 S.W. at 363, and from interfering

with internal management decisions that are central to its mission, such as investigating the conduct and character of its clergy, *see Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060; *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring).

The court of appeals' opinion in *Shannon* provides a helpful contrast. In that case, Memorial Presbyterian Church and its former employee, Jessica Shannon, reached an agreement settling a dispute about her termination. 476 S.W.3d at 618. The agreement included a nondisparagement clause. *Id.* After Shannon obtained employment at Austin Presbyterian Theological Seminary as a development officer, which required her to raise funds for the Seminary, it reached out to Memorial Presbyterian for her references. *Id.* The church's executive director, acknowledging that the parties had reached a settlement agreement that limited what he could say, made a variety of statements regarding Shannon's ability to carry out her duties to raise funds, which Shannon alleged led to her termination. *Id.* at 618–19. In concluding that the ecclesiastical abstention doctrine did not bar the suit, the court reasoned that Shannon's claims were directed at Memorial Presbyterian's violation of the nondisclosure agreement. *Id.* at 624. The statements that Shannon identified as leading to her termination related to her capacity to operate as a development officer and raise funds, unrelated to any ministerial or clerical role. *See id*. at 624–25. The court could apply neutral principles of contract law to determine whether the church disparaged her in violation of the settlement agreement without intervening in areas traditionally held to involve religious doctrine; interpreting church constitutions, by-laws, or governing documents; or deciding matters of the congregational or hierarchical nature of the church. *Id.*

The same is not true for Guerrero. Unlike in *Shannon*, Guerrero's claim is tied to the Diocese's decision to investigate allegations against its clergy. The actions complained of in

*Shannon* were divorced from the employee's underlying termination and any other traditional matter of church governance. *Id.* The reference provided by Memorial Presbyterian's executive director was about Shannon's capacity to function as a development officer, not a pastor. *Id.* Thus, the court was able to apply neutral principles of contract law to determine whether the church complied with the settlement agreement, which was not itself ecclesiastical, and the claims did not require the court "to intervene in the hiring, firing, discipline, or administration of the Church's clergy" or the exercise of its First Amendment rights. *Id.* at 624.

Although Guerrero contends that neutral principles could resolve this dispute, his own pleadings and concessions cut against this argument because his suit ultimately challenges the result of a church's internal investigation into its own clergy, which is inherently ecclesiastical. Even to the extent that his suit challenges the publication of the list, as the court of appeals concluded, the Diocese only published the results of its own investigation. That is, Guerrero's claims are inextricably intertwined with the Diocese's decision to include his name on the list— which it published on its website as an ordinary means of communication to its membership—at the culmination of its investigation into its clergy. The Diocese's public statements about the list neither mention nor reference Guerrero's name. Thus, the list's publication, and Guerrero's suit, cannot be severed from the process that led to its creation.

The dissent disagrees, arguing that the underlying investigation is immaterial because Guerrero's suit complains only about the Diocese's including his name on the list published to its website. *Post* at ___. However, the reason Guerrero appeared on the list is that the Diocese conformed to the Charter, an internal directive to investigate its clergy. The Diocese's compliance with its directive, and the results of that investigation, is a predicate to Guerrero's suit. Exercising

jurisdiction over it would necessarily "encroach[] on the church's ability to manage its internal affairs." *Westbrook*, 231 S.W.3d at 395. Thus, even assuming the dissent is correct that a court could apply neutral principles to interpret a Canonical term, *post* at ___, doing so would invade a religious institution's "autonomy with respect to internal management decisions that are essential to the institution's central mission," *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060. Here, exercising jurisdiction would invade the Diocese's internal management decision to investigate its clergy consistent with its own norms and policies.

Moreover, that the Diocese made public statements about its new policy and a statement at the completion of its investigation does not necessarily foreclose ecclesiastical protection. *See Patton*, 212 S.W.3d at 555 n.12 (noting that scope of publication is "not a bright-line rule"). The doctrine allows a religious institution to engage freely in ecclesiastical discussions with more than just its members. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002). It extends to publications that relate to a religious group's right to shape its own faith and mission. *Hosanna-Tabor*, 565 U.S. at 188. The Diocese, in exercising its right to shape its own faith and mission, disclosed to the public its reforms to handling sexual-abuse allegations within the church. Such discussion of changes in church policy, which the Diocese explains were rooted in broader church governance decisions, do not revoke ecclesiastical protection. *See, e.g.*, *Whole Woman's Health*, 896 F.3d at 374 ("[T]he importance of securing religious groups' institutional autonomy, while allowing them to enter the public square, cannot be understated . . . ."); *see also Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring) ("A religious body's control over such 'employees' is an essential component of its freedom to speak in its own voice, both to its own members and to the outside world."). Curtailing First Amendment

protections when a church exercises its right to shape its own faith and mission threatens to entangle the courts in a religious dispute.[3] S*ee Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 12 (Tex. 2008) ("Particularly, when the adherent's claim, as here, involves only intangible emotional damages allegedly caused by a sincerely held religious belief, courts must carefully scrutinize the circumstances so as not to become entangled in a religious dispute."). Such entanglement here could allow a court to secularize a church term—who may constitute a "minor" under Canon Law—and jeopardize a church's ability to establish its own rules and regulations for adequately investigating its clergy. *See Brown*, 116 S.W. at 363. In other words, allowing Guerrero's suit to move forward would threaten the Diocese with civil tort liability for acting in accord with its directive to investigate its clergy or for not conducting that investigation consistent with judicial standards, thereby depriving the Diocese of its "right to construe and administer church laws." *Westbrook*, 231 S.W.3d at 400 (collecting authorities).

## IV.    Conclusion

Religious groups have a First Amendment right to decide for themselves—free from court interference—matters of ecclesiastical governance as well as faith and doctrine. *Id.* at 397, 405. Exercising jurisdiction over the underlying case will not only require the trial court to evaluate whether the Lubbock Diocese properly applied Canon Law but will also encroach on the Diocese's decision to investigate its clergy consistent with its internal policies. Accordingly, we conditionally

---

[3] Of course, First Amendment rights are not unlimited. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (citing *United States v. Williams*, 553 U.S. 285 (2008)). We have previously stated that the "[f]reedom to believe may be absolute, but freedom of conduct is not, and conduct even under religious guise remains subject to regulation for the protection of society." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 12 (Tex. 2008) (collecting cases); *see Cantwell v. Connecticut*, 310 U.S. 296, 304 (1941) ("In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."). The Diocese's investigation and subsequent statements about its investigation, however, do not cross this line.

grant the Lubbock Diocese's petition for writ of mandamus, vacate the trial court's order denying the Diocese's plea to the jurisdiction, and direct the trial court to dismiss the underlying case for want of jurisdiction. Our writ will issue only if the trial court does not comply.

_____
John P. Devine
Justice

**OPINION DELIVERED:** June 11, 2021