# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A25-0559

Reyzl Grace MoChridhe,
Appellant,

vs.

Academy of Holy Angels,
Respondent,

Archdiocese of St. Paul and Minneapolis,
Respondent.

**Filed December 1, 2025**
**Affirmed**
**Larkin, Judge**

Hennepin County District Court
File No. 27-CV-24-11601

Jess Braverman, Brittany Stewart (pro hac vice), Gender Justice, St. Paul, Minnesota; and

Joni M. Thome, Katherine Rollins, Wanta Thome PLC, Minneapolis, Minnesota (for appellant)

Katie M. Connolly, Sara Gross Methner, Sara L. Lewenstein, Nilan Johnson Lewis PA, Minneapolis, Minnesota; and

Thomas B. Wieser, Thomas Wieser Law, West St. Paul, Minnesota (for respondent Holy Angels)

Paul J. Zech, Scott D. Blake, Felhaber Larson, Minneapolis, Minnesota; and

Lorie S. Gildea, Greenberg Traurig, LLP, Minneapolis, Minnesota (for respondent Archdiocese)

Leslie L. Lienemann, Celeste E. Culberth, Culberth & Lienemann, LLP, St. Paul, Minnesota; and

Brian T. Rochel, Kitzer Rochel, PLLP, Minneapolis, Minnesota; and

Claire Bruner-Wiltse, Schaefer Halleen, LLC, Minneapolis, Minnesota; and

Drew Kudlinski, HKM Employment Attorneys, LLP, Minneapolis, Minnesota; and

Stephen M. Premo, Premo Frank PLLC, Minneapolis, Minnesota; and

Zane Umsted, Madia Law LLC, Minneapolis, Minnesota (for amicus curiae Employee Lawyers of the Upper Midwest and Minnesota National Employment Lawyers Association)

Caitlin L. Opperman, Nichols Kaster, PLLP, Minneapolis, Minnesota; and

Teresa Nelson, Alicia Granse, Hannah Grayson, American Civil Liberties Union of Minnesota, Minneapolis, Minnesota (for amicus curiae American Civil Liberties Union of Minnesota)

Celeste E. Culberth, Culberth & Lienemann, LLP, St. Paul, Minnesota (for amicus curiae Americans United for Separation of Church and State)

Considered and decided by Bond, Presiding Judge; Ross, Judge; and Larkin, Judge.

## SYLLABUS

A court properly dismisses sex or sexual orientation employment-discrimination claims against a church under Minn. R. Civ. P. 12.02(e) if the allegations in the complaint, construed in plaintiff's favor, establish that the court's adjudication of plaintiff's claims would violate the religious freedom provisions of the First Amendment as a matter of law.

## OPINION

**LARKIN**, Judge

Appellant, a former media specialist/librarian at a Catholic school, challenges the district court's dismissal of her employment-discrimination claims against respondent Archdiocese, which were based on sex and sexual orientation. Because appellant's

complaint establishes—as a matter of law—that appellant's claims are foreclosed by the First Amendment church autonomy doctrine, we affirm.

## FACTS

In August 2024, appellant Reyzl Grace MoChridhe sued respondents Academy of Holy Angels and Archdiocese of St. Paul and Minneapolis,[1] alleging discrimination, specifically, nonrenewal of MoChridhe's employment contract based on MoChridhe's sex and sexual orientation. Our recitation of the facts is taken from MoChridhe's complaint and the documents referenced in her complaint. We accept the factual allegations in her complaint as true and construe all reasonable inferences in her favor. *See Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003) ("The reviewing court must consider only the facts alleged in the complaint, accepting those facts as true and must construe all reasonable inferences in favor of the nonmoving party.").

As alleged in her complaint, MoChridhe is Jewish and "a transgender woman, meaning she was assigned male at birth but lives and identifies as a woman." On July 19, 2021, Holy Angels presented MoChridhe "with an offer of employment and a detailed job description for a Media Specialist/Librarian position to be reviewed and signed." MoChridhe "signed the Employment Agreement that same day." According to MoChridhe's complaint, the job description contains a "Purpose" section that "describes the mission statement of [Holy Angels]" and states "[t]he mission of [Holy Angels] is to educate and nurture a diverse student population" and "[t]he Media Specialist/Librarian

---

[1] According to the complaint, Holy Angels is registered as a nonprofit corporation and the Archdiocese is a Minnesota diocesan corporation.

selects media resources, serves patrons and collaborates with the professional staff to support the mission of the Academy of Holy Angels." According to the job description, "[t]he Library/Media Specialist administers the library department and promotes library literacy. Library literacy encompasses all the skills needed to locate, retrieve, evaluate, and use information." The job posting for the media specialist/librarian position was based entirely on secular criteria. Holy Angels did not expect MoChridhe to evangelize the Catholic faith or to lead students in prayer.

According to the complaint, "[t]he 'Bylaws of [Holy Angels]' state that [Holy Angels'] Board's actions are to be at all times 'informed by and conducted in accordance with the tenets of the Roman Catholic Church as determined by the Archbishop of the Archdiocese.'" Holy Angels provided MoChridhe with an employee handbook, which indicated that her benefits would be provided by the Archdiocese.

MoChridhe's employment agreement covered the 2021-22 school year. In March 2022, all Holy Angels staff were asked to submit an intention to renew their employment agreement for the 2022-23 school year by April 22, 2022. If they did not do so, their resignations would be assumed. Soon after, MoChridhe met with Holy Angels' principal. MoChridhe told the principal that she wanted to come back but that she first wanted to confirm there was interest in having her return. The principal assured MoChridhe that the school wanted her to return. MoChridhe then "revealed she had come out as transgender and was starting the process of transitioning to live as her female self." The principal said the Archdiocese would not support MoChridhe's transition, and it would not be possible for MoChridhe to continue working at the school if she was determined to transition.

4

About a week later, MoChridhe again met with the principal and was presented with a copy of the "Guiding Principles for Catholic Schools and Religious Education Concerning Human Sexuality and Sexual Identity." Because of their relevance to the issues in this case, we repeat them in their entirety.

Guiding Principles for Catholic Schools and Religious
Education Concerning Human Sexuality and Sexual Identity

Purpose

The Catholic school is committed to providing a safe environment that allows students to flourish academically, physically, and spiritually. Catholic schools are obliged to provide an education and resources consistent with Catholic teaching. The starting point for Catholic education is a deeply held understanding that affirms the God-given irrevocable dignity of every human person.

Catholic teaching permeates and shapes the ethos of Catholic schools. Informed by Catholic teaching, these Guiding Principles shall inform the creation of policies, handbooks, statements, employee agreements, training for employees, and the approach to accompaniment in the Catholic schools of the Diocese of [insert], thus ensuring that the immeasurable dignity of every child is protected and respected, particularly as it relates to foundational beliefs of the Catholic Church:

- God created each person body and soul "in His own image, in the image of God he created them; male and female he created them" (Gen. 1:27). The dignity of each person and the source of his or her most important identity is found in this creation in the image and likeness of God (*CCC* §364).

- God uses the body to reveal to each person his or her sexual identity as male or female. A person's embrace of his or her God-given sexual identity is an essential

5

part of living a fulfilled relationship with God, with oneself, and with each other (*Laudato Si* §155).

- The harmonious integration of a person's sexual identity with his or her sex is an expression of the inner unity and reality of the human person made body and soul in the image and likeness of God (*CCC* §364-65).

- The physical, moral, and spiritual differences between men and women are equal and complementary. The flourishing of family life and society depend in part on how this complementarity and equality are lived out (*CCC* §2333-34).

- All students and families deserve interactions with Catholic school communities that are marked by respect, charity, and the truth about human dignity and God's love (*Deus Caritas Est* §20).

Application of Guiding Principles

The aforementioned Guiding Principles are practically applied in Catholic schools. Catholic schools in the Diocese of [insert] will relate to each student in a way that is respectful of and consistent with each student's God-given sexual identity and biological sex. To this end, below are some examples of how these Guiding Principles apply to organizations that teach children and youth in the name of the Catholic Church in the Diocese of [insert].

1. All school policies, procedures, resources, employee training, and assistance given to families will be consistent with the Church's teaching on the dignity of the human person, including human sexuality. Reflective of a commitment to a culture of transparency and understanding, these policies will be made available in writing to members of the school community by way of inclusion in relevant handbooks, agreements, and statements.

2. Student's name and pronoun usage will correspond to his/her sex (see definitions).

3. Student access to facilities and overnight accommodations will align with his/her sex.

4. Eligibility for single-sex curricular and extracurricular activities will be based on the sex of the child.

5. Expressions of a student's sexual identity are prohibited when they cause disruption or confusion regarding the Church's teaching on human sexuality.

6. Students who attend and employees who work at a Catholic school can expect that the school acknowledges that God has created each person as a unity of body and soul, as male or female, and that God-designed sexual expression and behavior must be exclusively oriented to love and life in marriage between one man and one woman.

7. Schools will communicate with parents or guardians about their child's behavior at school and inform them of any concerns relating to the physical, emotional, social, and spiritual health, safety, or welfare of their child, except when advised otherwise by law enforcement or a social service agency.

Definitions

1. Sex refers to a person's biological identification as male or female based upon physical characteristics present at birth.

2. Sexual identity refers to a person's identity as male or female that is congruent with one's sex.

3. Sexual binary refers to the God-given gift of the human family created male or female in the image and likeness of God.

4. Transgender or gender non-conforming is an adjective describing a person who perceives his or her sexual identity to be different from his or her sex and publicly presents himself or herself as the opposite sex or outside the sexual binary. Such

public expressions that are intended to communicate a sexual identity different from one's sex include, but are not limited to, utilizing pronouns of the opposite sex, changing one's name to reflect the cultural norms of the opposite sex, wearing a uniform designated for the opposite sex, and undergoing surgery to change the appearance of one's reproductive or sexual anatomy.

The principal asked MoChridhe if she could adhere to the Guiding Principles. Holy Angels had not previously shown MoChridhe the Guiding Principles or anything like it. After reviewing the Guiding Principles, MoChridhe said that "she did not believe she could abide by the directives." MoChridhe's complaint alleges that the Guiding Principles "instruct schools who teach in the name of the Catholic Church to discriminate against transgender and gender-nonconforming students by, for example, refusing to recognize their pronouns and preferred name if they are inconsistent with a student's sex assigned at birth, and refusing to allow LGBTQ+ students to express their sexual identity."

According to MoChridhe's complaint, the principal told MoChridhe "that the Guiding Principles document was the only reason she was not being offered a renewed contract." It was clear to MoChridhe that "what she was being told was that she would not be allowed to work at [Holy Angles] given that she is transgender." The principal asked MoChridhe to submit a formal resignation letter by June 7, 2022. MoChridhe did not do so.

On April 22, 2022, the final day to submit an employee's intent to return, MoChridhe contacted Holy Angels' human resources (HR) department. The HR representative was not aware of MoChridhe's previous conversations with the principal. MoChridhe told the HR representative that "she wanted it on record that she wanted to

8

return for the following school year, that she would sign a contract if allowed, and that the Guiding Principles document was the only reason she cannot return."

In June 2022, Holy Angels posted a job opening for the library/media specialist position. MoChridhe's complaint states that "[a]s with the previous posting for the position, the posting did not list any ministerial duties and did not require any religious training or education." MoChridhe applied for the position using the same application that had been used the year prior with updated information including the experience she gained during her year of employment at Holy Angels. MoChridhe did not get a response to the updated application until August 1, 2022, when an HR representative sent her a letter thanking her for the application but indicating the position had been filled. MoChridhe finished out her 2021-22 contract with Holy Angels on August 15, 2022.

MoChridhe filed a discrimination charge with the Minnesota Department of Human Rights (MDHR). MoChridhe submitted her charge on a form, and she checked boxes indicating employment discrimination based on sex and sexual orientation/gender identity in violation of the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.001-.50 (2022). In the form, MoChridhe described the basis for her discrimination claims and discussed the Guiding Principles and the Archdiocese's involvement. Later, MoChridhe notified the MDHR of her intent to bring a civil action.

MoChridhe's ensuing complaint against Holy Angels and the Archdiocese raised three MHRA claims and one common-law claim: (1) discrimination in employment based on sexual orientation (gender identity) under Minn. Stat. § 363A.08, subd. 2, (2) discrimination in employment based on sex under Minn. Stat. § 363A.08, subd. 2,

9

(3) aiding and abetting discrimination by the Archdiocese under Minn. Stat. § 363A.14, and (4) discrimination-based negligence by the Archdiocese.

The Archdiocese moved to dismiss MoChridhe's claims against the Archdiocese under Minn. R. Civ. P. 12.02(e), for failure to state a claim upon which relief can be granted. The district court granted that motion and dismissed MoChridhe's claims against the Archdiocese with prejudice.

The district court relied on two documents referenced in the complaint and filed by the Archdiocese in support of its motion to dismiss: the Guiding Principles and a copy of the discrimination charge that MoChridhe filed with the MDHR. The district court concluded that MoChridhe's claims against the Archdiocese were based on the Guiding Principles, which the Archdiocese imposed on Holy Angels, and that resolution of MoChridhe's claims therefore required examination of the Archdiocese's faith-based doctrines, the relationship between the Archdiocese and Holy Angels, church governance, and the provision of education through Holy Angels. Again, MoChridhe's complaint alleges that Holy Angels' bylaws state that Holy Angels' board's actions are to be at all times "informed by and conducted in accordance with the tenets of the Roman Catholic Church as determined by the Archbishop of the Archdiocese." The district court therefore determined that the religious-freedom provisions in the United States and Minnesota Constitutions precluded MoChridhe's claims. The district court also determined that MoChridhe's MHRA sexual-orientation claim failed under Minn. Stat. § 363A.26, an MHRA religious-association exemption. The district court rejected the Archdiocese's other proffered grounds for dismissal.

10

Final partial judgment was entered, and this appeal followed.

## ISSUE

**Did the district court err in dismissing MoChridhe's claims against the Archdiocese on the ground that the claims are precluded by the church autonomy doctrine under the First Amendment to the United States Constitution?**

## ANALYSIS

We review a grant of a motion to dismiss under Minn. R. Civ. P. 12.02(e) for failure to state a claim de novo, and we must "determine whether the pleadings set forth a legally sufficient claim for relief." *Abel v. Abbott Nw. Hosp.*, 947 N.W.2d 58, 68 (Minn. 2020). We consider only the facts alleged in the complaint, accepting those facts as true and construing all reasonable inferences in favor of the nonmoving party. *Bodah*, 663 N.W.2d at 553. We may consider documents referenced in the complaint. *N. States Power Co. v. Minn. Metro. Council*, 684 N.W.2d 485, 490 (Minn. 2004). And we are not bound by legal conclusions in a complaint. *Ward v. El Rancho Manana, Inc.*, 945 N.W.2d 439, 445 (Minn. App. 2020), *rev. denied* (Minn. Sept. 29, 2020). A claim survives a motion to dismiss for failure to state a claim "if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded." *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 603 (Minn. 2014). Constitutional issues are questions of law that we review de novo. *Pfeil v. St. Matthews Evangelical Lutheran Church*, 877 N.W.2d 528, 536 (Minn. 2016).

Under the MHRA, it is an unfair employment practice for an employer to refuse to hire or to discharge an employee because of the employee's sex or sexual orientation. Minn. Stat. § 363A.08, subd. 2. And, under the version of the MHRA in effect at the time

of the events underlying MoChridhe's claims, sexual orientation was defined to include "having or being perceived as having a self-image or identity not traditionally associated with one's biological maleness or femaleness." Minn. Stat. § 363A.03, subd. 44. This was generally understood to extend the protections of the MHRA to transgender individuals. *See Cooper v. USA Powerlifting*, __ N.W.3d ___, ___, 2025 WL 2970023, at \*7 (Minn. Oct. 22, 2025) (noting the parties' agreement "that discrimination based on transgender status is discrimination based on sexual orientation under the 2018 version of the MHRA").[2] It is also unlawful for any person "intentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by" the MHRA. Minn. Stat. § 363A.14(1).

There is no dispute that MoChridhe sufficiently pleaded her claims for violations of the MHRA. Instead, we are asked to decide whether those MHRA claims, as pleaded, are foreclosed by the First Amendment.

*The First Amendment*

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The religious freedom provisions in the First Amendment "protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*,

---

[2] In 2023, the legislature changed the definition for sexual orientation and added a definition for gender identity. 2023 Minn. Laws ch. 52, art 19, §§ 46-48, at 1150. The legislature also changed the employment-discrimination statute to address gender identity. 2023 Minn. Laws ch. 52, art 19, §§ 52-56, at 1152-55.

12

591 U.S. 732, 746 (2020) (quotations omitted). "State interference in that sphere would obviously violate the free exercise of religion." *Id.* Although religious institutions are not generally immune from secular laws, the First Amendment protects their "autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* "[A]ny attempt by government to dictate or even to influence [matters of faith and doctrine] would constitute one of the central attributes of an establishment of religion," and "[t]he First Amendment outlaws such intrusion." *Id.*

*The Church Autonomy Doctrine*

"The legal principle that has come to be known as the 'ecclesiastical abstention doctrine' or the 'church autonomy doctrine' has its roots in a line of U.S. Supreme Court decisions regarding church property and church schisms."[3] *Pfeil*, 877 N.W.2d at 532. Although none of those decisions directly addresses the factual circumstances of this case, "several helpful rules can be drawn from them." *Id.* at 534. Among them is the following rule: although courts can resolve disputes involving religious organizations, they may do so "only if" (1) they are "able to resolve the matter by relying exclusively on neutral principles of law," (2) they do not "disturb the ruling of a governing ecclesiastical body with respect to issues of doctrine," and (3) "the adjudication does not interfere with an internal church decision that affects the faith and mission of the church itself." *Id.* (quotation omitted). The third factor is dispositive here.

---

[3] We use the phrase "church autonomy doctrine" in this opinion.

13

In *Doe v. Lutheran High School*, this court concluded that the First Amendment prohibited resolution of a discrimination claim brought under the MHRA by an ordained minister who was a religious teacher and campus pastor at a religious high school, and who claimed that he was wrongfully discharged based on his sexual orientation. 702 N.W.2d 322, 324 (Minn. App. 2005), *rev. denied* (Minn. Oct. 26, 2005). We reasoned that "Doe's assertion that he should not have been discharged based on his sexual orientation would require the court to analyze and apply church doctrine to assess his argument" and that "this type of searching inquiry intrudes into church doctrine and church administrative matters and engenders a prohibited relationship between the church and the judiciary." *Id.* at 327.

We reach a similar conclusion here. We recognize that the allegations in MoChridhe's complaint are unlike the facts in *Doe* in that she is not an ordained minister, she was not a teacher or pastor at the school, and her position was secular. Regardless of the secular nature of the job posting, MoChridhe's complaint alleged that "[t]he 'Bylaws of [Holy Angels]' state that [Holy Angels'] Board's actions are to be at all times 'informed by and conducted in accordance with the tenets of the Roman Catholic Church as determined by the Archbishop of the Archdiocese.'" Thus, consideration of MoChridhe's claims—as alleged in her complaint—would require the judiciary to consider the role that church doctrine played in the decision not to renew her employment contract with Holy Angels. Importantly, it would require the judiciary to consider the Archdiocese's decision to require an employee in one of its Catholic schools to adhere to its faith-based Guiding Principles in the school setting.

14

As set forth above, the Guiding Principles document includes a "Purpose" section that sets forth the "foundational beliefs of the Catholic Church." It also addresses application of the Guiding Principles stating that Catholic schools in the Diocese "will relate to each student in a way that is respectful of and consistent with each student's God-given sexual identity and biological sex." The Guiding Principles document defines "sex" as "a person's biological identification as male or female based upon physical characteristics present at birth" and defines "sexual identity" as "a person's identity as male or female that is congruent with one's sex." Finally, the Guiding Principles document directs, among other things, that "[s]tudent's name and pronoun usage will correspond to his/her sex," "[s]tudent access to facilities and overnight accommodations will align with his/her sex," "[e]ligibility for single-sex curricular and extracurricular activities will be based on the sex of the child," and "[e]xpressions of a student's sexual identity are prohibited when they cause disruption or confusion regarding the Church's teaching on human sexuality."

According to MoChridhe's complaint, Holy Angels' principal asked MoChridhe if she "could adhere to the document's requirements." "After reviewing the Guiding Principles," MoChridhe said "she did not believe she could abide by the directives." As to the directives, MoChridhe's complaint alleges that the Guiding Principles document "instruct[s] schools who teach in the name of the Catholic Church to discriminate against transgender and gender-nonconforming students by, for example refusing to recognize their pronouns and preferred name if they are inconsistent with a student's sex assigned at birth, and refusing to allow LGBTQ+ student to express their sexual identity." In sum,

15

MoChridhe's complaint alleges that the directives implementing the Guiding Principles in the school setting were discriminatory and she informed Holy Angels that she could not abide by them.

MoChridhe argues that adjudication of her claims will not require the judiciary to interpret church doctrine. She may be correct, but that does not end our inquiry under the church autonomy doctrine. The Archdiocese's decision to require an employee in one of its Catholic schools to adhere to its faith-based Guiding Principles in the school setting "affects the faith and mission of the church itself." *Pfeil*, 877 N.W.2d at 534 (quotation omitted). As to this issue, courts have recognized that "[t]he education of children within a Catholic school system is a significant factor in the propagation of the Catholic faith." *Hill-Murray Fed'n of Tchrs. v. Hill-Murray High Sch.*, 487 N.W.2d 857, 865 (Minn. 1992). "[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe*, 591 U.S. at 753-54. In short, "[i]n the Catholic tradition, religious education is intimately bound up with the whole of the Church's life." *Id.* at 754 (quotations omitted).

Consistent with the mission of a private religious school, and as acknowledged in MoChridhe's complaint, "[t]he mission of [Holy Angels] is to educate and nurture a diverse student population," and the media specialist/librarian "collaborates with the professional staff to support the mission of the Academy of Holy Angels." Although MoChridhe acknowledges—in her complaint—that as the media/specialist, she was expected to "collaborate[] with the professional staff to support the mission of the Academy of Holy

16

Angels," MoChridhe nonetheless informed Holy Angels' principal that she could not abide by the directives in the Guiding Principles.

In short, MoChridhe asks the judiciary to require the Archdiocese to employ a person who does not support and will not abide by the church's faith-based Guiding Principles in the school setting, despite the Archdiocese's internal decision to require adherence to those principles when executing its mission to educate students in the Catholic faith. MoChridhe does not cite, and we are not aware of, any case that compels that result in the face of a church's religious protections under the First Amendment. Again, training young people to live their faith "lie[s] at the very core of the mission of a private religious school." *Our Lady of Guadalupe*, 591 U.S. at 753-54. Given the significant role that the Catholic faith plays in Catholic education and the church's mission to train young people to live the Catholic faith, requiring the Archdiocese to employ a person in its Catholic school who admittedly cannot abide by the church's implementation of its Guiding Principles in that school would interfere with an internal church decision that affects the faith and mission of the church itself. *Cf. Hill-Murray*, 487 N.W.2d at 866 (stating that under the Minnesota Constitution, although a Catholic high school could be subject to the Minnesota Labor Relations Act, the school retained "the power to hire employees who meet their religious expectations, to require compliance with religious doctrine, and to remove any person who fails to follow [its] religious standards").

The principle that a claim against a church is foreclosed if a court's adjudication of the claim would interfere with an internal church decision that affects the faith and mission of the church itself is substantially similar to a related principle: a state action must not

17

foster excessive governmental entanglement with religion. *See Pfeil*, 877 N.W.2d at 537

(describing the related principles and applying both). MoChridhe's complaint is clear: she

seeks to entangle church and state in a way that is constitutionally intolerable. In her

request for relief, MoChridhe requests:

> 1. That the practices of Defendants complained of herein be adjudged, decreed, and declared to be in violation of the rights secured to Plaintiff by the . . . [MHRA].
> 2. That a *permanent injunction be issued prohibiting Defendants from engaging in the practices complained of herein.*
> 3. That the Court *order Defendants to pay a civil penalty* to the State of Minnesota pursuant to Minn. Stat. § 363A.29.
> 4. That Plaintiff be awarded compensatory damages in an amount greater than $50,000.
> 5. That *Plaintiff be awarded treble damages* pursuant to Minn. Stat. §§ 363A.33 and 363A.29.
> 6. That *Plaintiff be awarded punitive damages* pursuant to Minn. Stat. § 363A.29 in an amount to be determined at trial.
> 7. That the Court issue an order enjoining Defendants and their officers, agents, and employees from subjecting Plaintiff to differential treatment and from any retaliation against Plaintiff for prior actions, or for bringing this action.
> 8. *That the Court retain jurisdiction until the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law.*

(Emphasis added.)

In sum, MoChridhe asks the Minnesota judiciary to issue a secular judgment

decreeing the Archdiocese's implementation of Catholic doctrine in Catholic schools

illegal, to monitor the Archdiocese until the Minnesota judiciary is "satisfied" that the

Archdiocese has abandoned the allegedly illegal implementation of its religious doctrine

in its Catholic schools, and to financially sanction the Archdiocese for adhering to its faith-

based beliefs when making employment decisions in a Catholic school setting. Granting such relief would be fundamentally at odds with the religious freedoms protected by the First Amendment, as envisioned by our founding fathers. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 183, 194 (2012) (describing historical background against which the First Amendment was adopted, holding that the First Amendment required dismissal of an employment-discrimination suit against a religious employer, and stating that an award of financial relief "would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination").

The government may not compel a church to conform its sincerely held religious beliefs to those of the government. *See Geraci v. Eckankar*, 526 N.W.2d 391, 399 (Minn. App. 1995) ("If courts begin to question a church's basis for doctrinal decisions, a church may be compelled to conform its religious beliefs with the government's or the majority culture's beliefs."), *rev. denied* (Minn. Mar. 14, 1995). "[A]ny attempt by government to dictate or even to influence [matters of faith and doctrine] would constitute one of the central attributes of an establishment of religion," which "the First Amendment outlaws." *Our Lady of Guadalupe*, 591 U.S. at 746. MoChridhe seeks to do exactly that. The First Amendment does not allow it.

*MoChridhe's Arguments*

MoChridhe makes five arguments in support of her contention that her lawsuit does not violate the First Amendment and should not have been dismissed. None is persuasive.

19

1.

MoChridhe argues that the church autonomy doctrine does not foreclose her lawsuit for the following reasons: (1) she "is a lay employee who brought colorable claims of discrimination and negligence under neutral and generally applicable laws," (2) she "was neither qualified nor expected to minister the Catholic faith or to be a member of the Catholic church," and (3) she does not challenge the Archdiocese's "interpretation of scripture and does not raise a dispute over church property, church membership or excommunication, nor does she ask a court to resolve any such dispute."

Although MoChridhe has identified some factual differences between this case and precedent, we are not persuaded that those differences require a conclusion that judicial resolution of MoChridhe's claims would not unconstitutionally intrude on the autonomy of the Catholic Church or entangle the church and state in way that is constitutionally intolerable. The factual differences merely present a need to apply precedent to a set of facts not previously considered. Under the facts and circumstances of this case, application of precedent supports a conclusion that MoChridhe's claims cannot be adjudicated by the judiciary without violating the religious freedom provisions of the First Amendment.

2.

MoChridhe argues that she asks the judiciary to determine only whether the MHRA "prohibits a religious institution from firing a transgender person," and "not whether a religious institution, like [the Archdiocese], has properly interpreted its religious doctrine

20

when determining that a transgender person violates religious law and must be fired."[4] The fact that we do not need to determine whether the Archdiocese has properly interpreted its religious doctrine does not end our inquiry under the church autonomy doctrine. Again, a court can resolve a dispute regarding a religious organization only if "the adjudication does not interfere with an internal church decision that affects the faith and mission of the church itself." *Pfeil*, 877 N.W.2d at 534 (quotation omitted).

MoChridhe's complaint alleges that the Guiding Principles were "the only reason" for the employment decision that is at issue here. The Guiding Principles state that they are "practically applied in Catholic schools." And binding precedent recognizes the significant role that Catholic faith plays in the Catholic school setting. Adjudicating MoChridhe's claims would require the judiciary to interfere with an internal church decision related to the church's mission to train its Catholic school students to live according to the Catholic faith. We cannot ignore the First Amendment implications of MoChridhe's lawsuit.

3.

MoChridhe argues that the federal constitution does not prohibit application of neutral, generally applicable regulatory laws to religious litigants. She relies on

---

[4] MoChridhe relies on federal district court and circuit court caselaw throughout her brief, including *Zinski v. Liberty University, Inc.*, 777 F. Supp. 3d 601 (W.D. Va. 2025). Although we may consider such caselaw as persuasive authority, we are bound by decisions of the Minnesota Supreme Court and the United States Supreme Court, and not by the decision of any other federal court. *Citizens for a Balanced City v. Plymouth Congregational Church*, 672 N.W.2d 13, 20 (Minn. App. 2003). We do not find the nonbinding federal cases persuasive.

*Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), *superseded by statute*, 42 U.S.C. §§ 2000bb to 2000bb-4 (Supp. 1993). The *Smith* Court held that the denial of two Native American Church members' claims for unemployment benefits after they were fired from their jobs for ingesting peyote, a crime under Oregon law, did not violate the Free Exercise Clause, even though the peyote had been ingested for sacramental purposes. 494 U.S. at 874, 890. The Supreme Court stated that the "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879 (quotation omitted).

But the Supreme Court limited application of *Smith* in *Hosanna-Tabor*, explaining:

> It is true that the [Americans with Disabilities Act's] prohibition on retaliation, like Oregon's prohibition on peyote use, is a valid and neutral law of general applicability. But a church's selection of its ministers is unlike an individual's ingestion of peyote. *Smith* involved government regulation of only outward physical acts. The present case, in contrast, concerns government interference with an internal church decision that affects the faith and mission of the church itself.

565 U.S. at 190. While we are mindful of the distinction between a religious minister and a secular media specialist/librarian, we conclude that this case is like *Hosanna-Tabor*, and not like *Smith*. This case concerns government interference with an internal church decision that affects the faith and mission of the church itself, and not a criminal act. *Smith* is further distinguishable because it did not involve a religious employer and did not raise the same concerns that are at issue here. *See Smith*, 494 U.S. at 874.

4.

MoChridhe argues that this case cannot be resolved with a dismissal under Minn. R. Civ. P. 12.02(e) because the factual record is inadequately developed. As to application of the church autonomy doctrine, we disagree. We accept the factual allegations in MoChridhe's complaint as true. Those allegations include that MoChridhe was not offered a renewed employment agreement with Holy Angels only because she informed Holy Angels that she could not abide by the directives in the Guiding Principles, as applied in the school setting. Those facts, as pleaded, establish that litigation of her claims and imposition of her request for relief would violate the First Amendment. Because the relevant facts are undisputed in this procedural posture and the First Amendment determination is one of law, dismissal is not premature. *See Hoskin v. Krsnak*, 25 N.W.3d. 398, 400-01 (Minn. 2025) (holding that, in the context of an affirmative defense, a motion to dismiss may be granted if the allegations in the complaint, construed in plaintiff's favor, establish an unrebuttable defense); *see also Pfeil*, 877 N.W.2d at 530 (affirming the district court's dismissal under the church autonomy doctrine).

5.

Finally, MoChridhe argues regarding the relevance of the "ministerial exception" in this case. Under that exception, churches and religious organizations are categorically exempt from compliance with employment-discrimination statutes when making decisions regarding ministerial employees. *Hosanna-Tabor*, 565 U.S. at 185-89.

MoChridhe argues that even though the Archdiocese did not raise the ministerial exception in district court, "it is difficult to discuss the interaction between anti-

23

discrimination law and religious liberties . . . without discussing the ministerial exception" and that "dismissal based on the ministerial exception is unwarranted." The Archdiocese responds that the ministerial exception is "a derivative of" the broader church autonomy doctrine. *See Pfeil*, 877 N.W.2d at 534 (stating the same). The Archdiocese argues that the ministerial exception applies to a defined group of employees of a religious organization, that is, "ministers," and that "another area of church autonomy applies to all employees of a religious organization—minister or not." In sum, the parties dispute whether the ministerial exception is the only way a religious employer can obtain First Amendment religious protections against an employment-discrimination claim.

The Archdiocese did not request dismissal under the ministerial exception in the district court, and the district court did not consider application of that exception when dismissing MoChridhe's claims. "A reviewing court must generally consider only those issues that the record shows were presented [to] and considered by the trial court in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (quotation omitted). However, that is not "an ironclad rule." *Oanes v. Allstate Ins. Co.*, 617 N.W.2d 401, 403 (Minn. 2000). Because there are no factual disputes that affect the purely legal question of whether First Amendment protections are available in this case only under the ministerial exception, we will briefly address the issue. *See* Minn. R. Civ. App. P. 103.04 (stating that an appellate court may "review any other matter as the interest of justice may require").

The Supreme Court has not expressly addressed this issue. Its seminal cases are *Hosannah-Tarbor* and *Our Lady of Guadalupe*. In *Hosanna-Tabor*, the Supreme Court

24

considered whether the First Amendment bars a terminated employee's employment-discrimination claim against a religious employer when the employee is one of the employer's ministers. 565 U.S. at 176. The Court noted that the federal appellate courts had uniformly recognized the existence of a "ministerial exception" under the First Amendment and that the exception had been relied on to preclude application of employment-discrimination laws "to claims concerning the employment relationship between a religious institution and its ministers." *Id.* at 188. The Supreme Court agreed that there is such an exception. *Id.* But the Court did not "adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 190, 196.

Although the *Hosanna-Tabor* Court determined that the exception applied in that case, noting that the case concerned "government interference with an internal church decision that affects the faith and mission of the church itself," the Court did not address whether the religious protections of the First Amendment are available to a religious employer defending an employment-discrimination claim by a non-minister who was terminated for religious reasons. *Id.* at 190.

In *Our Lady of Guadalupe*, the Supreme Court extended the reach of the ministerial exception, stating that "whether a particular position falls within the . . . exception, a variety of factors may be important." 591 U.S. at 751. "What matters, at bottom, is what an employee does." *Id.* at 753. Again, the Court did not address whether the religious protections of the First Amendment are available to a religious employer defending an employment-discrimination claim by a non-minister who was terminated for religious reasons.

25

In *Our Lady of Guadalupe*, Justice Sotomayor wrote a dissenting opinion, joined by Justice Ginsburg, criticizing the majority's expansion of the ministerial exception. The dissent noted that, when the exception applies, it is "extraordinarily potent" and "gives an employer free rein to discriminate because of race, sex, pregnancy, age, disability, or other traits protected by law when selecting or firing their 'ministers,' even when the discrimination is *wholly unrelated to the employer's religious beliefs or practices*." *Id.* at 767 (Sotomayor J., dissenting) (emphasis added). The relevance of a religious reason for a religious employer's alleged employment discrimination was stressed throughout the dissenting opinion. *Id.* at 766-85 (Sotomayor J., dissenting). Justice Sotomayor wrote that *Hosanna-Tabor's* "well-rounded approach ensured that a church could not categorically disregard generally applicable antidiscrimination laws for *nonreligious reasons*." *Id.* at 771-72 (Sotomayor J., dissenting) (emphasis added).

> So long as the employer determines that an employee's duties are vital to carrying out the mission of the church, then today's laissez-faire analysis appears to allow that employer to make employment decisions because of a person's skin color, age, disability, sex, or any other protected trait for *reasons having nothing to do with religion*.

*Id.* at 784 (Sotomayor J., dissenting) (emphasis added) (quotations and citation omitted). Finally, the dissent asserted that the majority's decision "permit[ed] religious entities to discriminate widely and with impunity for reasons *wholly divorced from religious beliefs*." *Id.* at 784-85 (Sotomayor J., dissenting) (emphasis added).

The dissent's emphasis on a church's ability to obtain First Amendment protection from a discrimination claim by a terminated employee based only on a determination that

26

the employee was a "minister"—despite the absence of any underlying religious reason for the employee's termination—begs the question: Does the First Amendment protect a religious employer from discrimination claims by a terminated non-minister employee if the termination was based on a religious reason? Given the facts alleged in MoChridhe's complaint and the absence of any binding precedent suggesting otherwise, we discern no basis to conclude that the broader religious protections of the First Amendment church autonomy doctrine are not available to the religious employer in that situation. *Cf. Bostock v. Clayton Cnty.*, *Georgia*, 590 U.S. 644, 682 (2020) (recognizing discrimination based on transgender status as discrimination based on sex under Title VII and that religious freedom issues were likely to follow stating, "while other employers in other cases may raise free exercise arguments that merit careful consideration, none of the employers before us today represent in this Court that compliance with Title VII will infringe their own religious liberties in any way").

As this case shows—on the face of MoChridhe's complaint—the decision not to offer her renewed employment at Holy Angels was based only on a religious reason: her stated inability to abide by the directives in the Guiding Principles, as applied in the school setting. Thus, consideration of MoChridhe's claims would require consideration of the Archdiocese's religious reason for the employment decision, would interfere with the Archdiocese's internal decision to require compliance with the Guiding Principles in the school setting—which relates to the church's mission to educate young people in its faith—and would foster excessive governmental entanglement with religion. The potential

inapplicability of the ministerial exception does not change that conclusion, and there is no precedent indicating that it must.[5]

In conclusion, we recognize the apparent tension between the government's interest in eliminating discrimination and the religious freedoms protected by the First Amendment. "The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and *carry out their mission*." *Hosanna-Tabor*, 565 U.S. at 196 (emphasis added); *see Geraci*, 526 N.W.2d at 399 ("There is a tension between eradicating discrimination and permitting the free exercise of religion; however, in this case, the balance weighs in favor of the First Amendment.").

Based on our application of precedent to the particular facts of this case—as alleged in MoChridhe's complaint—we hold that because the allegations in MoChridhe's complaint, construed in her favor, establish that the district court's adjudication of her claims would violate the religious protections of the First Amendment as a matter of law, the district court properly dismissed MoChridhe's employment discrimination claims against the Archdiocese for failure to state a claim under Minn. R. Civ. P. 12.02(e).

**DECISION**

Because the allegations in MoChridhe's complaint would interfere with an internal church decision that affects the Archdiocese's faith-based mission to educate young people in the Catholic faith and would foster excessive governmental entanglement with religion,

---

[5] Because the Archdiocese did not rely on the ministerial exception in district court, we do not consider or determine whether the exception applies in this case.

28

the district court properly dismissed those claims under Minn. R. Civ. P. 12.02(e) based on the First Amendment.  Because all MoChridhe's claims are foreclosed by the religious freedom provisions in the First Amendment to the United States Constitution, we do not consider her arguments regarding the alternative grounds on which the district court based its dismissal (i.e., the Minnesota Constitution's Freedom of Conscience Clause and the MHRA's religious-association exemption under Minn. Stat. § 363A.26).

**Affirmed.**